Revised December 28, 1998

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

————————————

No. 96-11224

————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

BRUCE CARNEIL WEBSTER,
a/k/a B-Love,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Northern District of Texas

————————————————

December 3, 1998

Before SMITH, DUHÉ, and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


Bruce Webster challenges his conviction of, and sentence for, kidnaping resulting in death, conspiring to kidnap, and using and carrying a firearm during a crime of violence.  We affirm.

I.

The facts are the same as in the case of Webster's co-conspirator, Orlando Hall.  *See United States v. Hall*, 152 F.3d 381 (5th Cir. 1998).  Webster, Hall, and Marvin Holloway ran a

marihuana trafficking enterprise in Pine Bluff, Arkansas. They purchased marihuana in varying amounts in the Dallas/Fort Worth area with the assistance of Steven Beckley, who lived in Irving, Texas. The marihuana was transported, typically by Beckley, to Arkansas and stored in Holloway's house.

On September 21, 1994, Holloway drove Hall from Pine Bluff to the airport in Little Rock, and Hall took a flight to Dallas to engage in a drug transaction. Beckley and Hall's brother, Demetrius Hall (D. Hall), picked up Hall at the airport. Later that day, Hall and Beckley met two local drug dealers, Stanfield Vitalis and Neil Rene (N. Rene), at a car wash and gave them $4700 for the purchase of marihuana. Later that day, Beckley and D. Hall returned to the car wash to pick up the marihuana, but Vitalis and N. Rene never appeared.

When Hall got in touch with Vitalis and N. Rene by telephone, they claimed they had been robbed of the $4700. Using the telephone number that Beckley had dialed to contact Vitalis and N. Rene, Hall procured an address at the Polo Run Apartments in Arlington, Texas, from a friend who worked for the telephone company. Hall, D. Hall, and Beckley began conducting surveillance at the address and saw Vitalis and N. Rene exit an apartment and approach the same car they had driven to the car wash, which they claimed was stolen from them along with the $4700. Hall therefore deduced that Vitalis and N. Rene had lied to him about having been robbed.

2

On September 24, Hall contacted Holloway and had him drive Webster to the Little Rock airport. From there, Webster flew to Dallas. That evening, Hall, D. Hall, Beckley, and Webster returned to the Polo Run Apartments in a Cadillac owned by Cassandra Ross, Hall's sister. Hall and Webster were armed with handguns, D. Hall carried a small souvenir baseball bat, and Beckley had duct tape and a jug of gasoline. They approached the apartment from which they had previously seen Vitalis and N. Rene leave.

Webster and D. Hall went to the front door and knocked. The occupant, Lisa Rene, N. Rene's sixteen-year-old sister, refused to let them in and called her sister and the police emergency phone number. After Webster unsuccessfully attempted to kick in the door, he and D. Hall looked through a sliding glass door on the patio and saw that Lisa Rene was on the telephone. D. Hall shattered the door with the bat; Webster entered the apartment, tackled Lisa Rene, and dragged her to the car.

Hall and Beckley had returned to the car when they heard the sound of breaking glass. Webster forced Lisa Rene onto the floorboard of the car, and the group drove to Ross's apartment in Irving. Once there, they exited the Cadillac and forced Lisa Rene into the back seat of Beckley's car; Hall climbed into the back seat as well. With Beckley at the wheel and Webster in the front passenger seat, they drove around looking for a secluded spot. During the drive, Hall raped Lisa Rene and forced her to perform fellatio on him.

Unable to find a spot to their liking, they eventually returned to Ross's apartment. From there, Beckley, D. Hall, and Webster drove Lisa Rene to Pine Bluff. Hall remained in Irving and flew back to Arkansas the next day. En route to Pine Bluff, Webster and D. Hall took turns raping Lisa Rene. Once Beckley, D. Hall and Webster reached Pine Bluff, they obtained money from Holloway to get a motel room. In the room, they tied Lisa Rene to a chair and raped her repeatedly.

Hall and Holloway arrived at the motel room on the morning of September 25. They went into the bathroom with Lisa Rene for approximately fifteen to twenty minutes. When Hall and Holloway came out of the bathroom, Hall told Beckley, "She know too much." Hall, Holloway, and Webster then left the motel.

Later that afternoon, Webster and Hall went to Byrd Lake Park and dug a grave. That same evening, Webster, Hall, and Beckley took Lisa Rene to the park but could not find the grave site in the dark, so they returned to the motel room. In the early morning of September 26, Beckley and D. Hall moved Lisa Rene to another motel because they believed the security guard at the first motel was growing suspicious.

The same morning, Webster, Hall, and Beckley again drove Lisa Rene to Byrd Lake Park. They covered her eyes with a mask. Hall and Webster led the way to the grave site, with Beckley guiding Lisa Rene by the shoulders. At the grave site, Hall turned Lisa Rene's back toward the grave, placed a sheet over her head, and hit

4

her in the head with a shovel. Lisa Rene screamed and started running. Beckley grabbed her, and they both fell down. Beckley hit her in the head twice with the shovel and handed it to Hall. Webster and Hall began taking turns hitting her with the shovel. Webster then gagged her and dragged her into the grave. He stripped her, covered her with gasoline, and shoveled dirt back into the grave. When buried, Lisa Rene, although unconscious, likely was still breathing. Hall, Beckley, and Webster then returned to the motel and picked up D. Hall.

Based on information from the victim's brothers, D. Hall was arrested; Hall and Beckley subsequently surrendered to the police. On September 29, just after turning himself in, Beckley gave a confession to a police detective and an FBI agent in which he admitted to the kidnaping of Lisa Rene and implicated himself, Hall, and an individual known as "B-Love." Beckley stated that he had last seen Lisa Rene at the Pine Bluff Motel with B-Love. A security guard at the motel informed the agents and officers that Webster went by the name B-Love, and provided a description of Webster and his vehicle. When Webster pulled into the motel parking lot during the early morning of September 30, he was detained and subsequently arrested.


II.

In November 1994, a six-count superseding indictment charged Webster, Hall, D. Hall, Beckley, and Holloway with various offenses

5

related to the kidnaping and murder of Lisa Rene. Specifically, the indictment charged Webster with kidnaping in which a death occurred in violation of 18 U.S.C. § 1201(a)(1) (count 1), conspiracy to commit kidnaping in violation of 18 U.S.C. § 1201(c) (count 2), traveling in interstate commerce with intent to promote extortion in violation of 18 U.S.C. § 1952 (count 5), and using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) (count 6). In February 1995, the government filed its notice of intent to seek the death penalty against Webster pursuant to § 3593(a) of the Federal Death Penalty Act of 1994 ("FDPA"), 18 U.S.C. §§ 3591-3598.

Webster's trial was severed from that of his co-defendants. The jury returned a verdict of guilty on counts 1, 2 and 6, and count five was dismissed on the government's motion. The court conducted a separate sentencing hearing before the same jury. *See* § 3593. After the penalty phase, the jury returned special findings that Webster satisfied the requisite elements of intent, *see* § 3591(a), and that three statutory and two non-statutory aggravating factors existed.[1] *See* § 3592. Varying numbers of

---

[1] The jury unanimously found all but the first of the following statutory aggravating factors:

> II(A).    The defendant, Bruce Carneil Webster, caused the death of Lisa Rene, or injury resulting in death of Lisa Rene, which occurred during the commission of the offense of kidnapping.

> II(B).    The defendant . . . committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse of Lisa Rene.

(continued...)

6

jurors found nine mitigating factors.[2]  *See* § 3592.  The court

[1](...continued)
II(C).        The defendant . . ., after substantial planning and premeditation, committed the offense of kidnapping in which the death of Lisa Rene resulted.

II(D).        The victim, Lisa Rene, was particularly vulnerable due to her age.

In addition, the jury unanimously found both of the proposed non-statutory aggravating factors:

III(A).        The defendant . . . constitutes a future danger to the lives and safety of other persons.

III(B).        The effect of the instant offense on Lisa Rene's family.

[2] Webster proposed the following statutory mitigating factors (with the number of jurors finding each mitigating factor shown in brackets):

1.      The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired. [0]

2.      The defendant was under unusual and substantial duress. [0]

3.      Another defendant or defendants, equally culpable in the crime, will not be punished by death. [4]

4.      The defendant does not have a significant prior history of other criminal conduct. [0]

5.      The defendant committed the offense under severe mental or emotional disturbance. [0]

Webster proposed the following non-statutory mitigating factors (with the number of jurors finding each mitigating factor shown in brackets):

1.      The defendant is or may be mentally retarded. [4]

2.      The defendant has low intellectual functioning. [4]

3.      The defendant suffered from physical abuse, from emotional abuse, and/or from parental neglect during his upbringing. [12]

4.      The defendant, as a result of a personality disorder, a mental illness, and/or low intellectual functioning, has a lesser capability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law than that of a  normal person. [0]

5.      The defendant was youthful at the time of the commission of
                                                    (continued...)

7

sentenced Webster to death on count one of the superseding indictment; life imprisonment on count two; and sixty months' imprisonment on count six to run consecutively to the sentence in count 2.

## III.

Webster raises several grounds for reversing his conviction

---

<sup></sup>2(...continued)
the crime, although not under the age of eighteen. [0]

6.  The defendant has talents, capabilities, or qualities which are of some value to society (such as musical talent, religious devotion, etc.). [0]

7.  The defendant is unduly susceptible to influence by others. [0]

8.  The defendant's level of participation in the commission of this offense was attributable, at least in part, to the influence of one or more of the other participants involved in the commission of this crime. [4]

9.  The defendant grew up in an atmosphere of violence and fear, which has misshaped his perception as to the acceptability or necessity of violent conduct. [6]

10.  The defendant can be controlled in a prison setting. [2]

11.  The defendant can be of some productive value in a prison setting. [0]

12.  The defendant has the love and support of other members of his family. [11]

13.  The defendant does not have a significant prior history of violent crime. [0]

14.  The defendant is the product of an impoverished background which virtually precluded his integration into the social and economic mainstream of the community. [0]

15.  The defendant has responded well to structured environments and would likely adapt to prison life if he were sentenced to life imprisonment. [2]

16.  Any other factor or factors in the defendant's background, record, or character or any other circumstance of the offense that mitigates against imposition of the death sentence. [0]

and/or sentence that we already have ruled on in *Hall*:

> 1.    The district court violated Webster's Fifth and Eighth Amendment rights by conditioning the admission of psychiatric testimony in mitigation of punishment upon Webster's submission to a government psychiatric examination.[3]
>
> 2.    The district court abused its discretion by admitting certain unfairly prejudicial materials into evidence, namely photographs and a videotape.[4]
>
> 3.    The admission of evidence regarding unadjudicated offenses[5] during the penalty phase and a lack of a jury

---

[3] Webster raises an additional Fifth Amendment argument relating to his compelled examination, not addressed in *Hall*, with which we deal *infra*.

[4]    Webster attempts to parlay his evidentiary objection into a constitutional claim; having upheld the evidence's admissibility as an evidentiary matter, we cannot conclude that its admission nonetheless violated his constitutional rights.

[5] Webster specifically complains about the following evidence:

- the oral statement "If I was out now, I'd kill the bitch" that gave him a venereal disease.

- the oral statement that killing Lisa Rene wasn't personal, "it was strictly business."

- an escape attempt where he entered an unauthorized area (the women's shower) of the Mansfield jail.

- the sexual rendezvous with female inmates planned with fellow inmate John Clay.

- the alleged shooting at a store owner after an attempted theft.

- the assault of Sheila Henry, a girlfriend.

- a shoving match over a piece of candy.

Webster also argues these should have been excluded because of the need for sufficient reliability of evidence in capital proceedings. *See Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985).

We find ample support in the record of the evidence's reliability, which justifies putting it before the jury. First, it was testimony based on first-hand observations; Webster had the opportunity to confront and challenge each of

(continued...)

instruction requiring the jury to apply some burden of proof to this evidence rendered the death sentence unreliable.

4.    The admission of nontestimonial victim impact statements violated due process and the Eighth Amendment, Webster's Sixth Amendment right of confrontation, and the FDPA's evidentiary standards.

We addressed and rejected each of these arguments in *Hall*, which controls the outcome here. [6]

IV.

Webster appeals his judgment of conviction and death sentence on the following grounds that we must address, as we did not consider them in *Hall*:

1.    The court erroneously instructed and materially misdirected the jury in numerous ways at the penalty phase.

2.    The court failed to instruct the jury accurately regarding on which non-monetary benefit(s) of the kidnapping the government relied and regarding the need for the jury to agree on such a benefit unanimously in order to convict in the guilt-innocence phase.

3.    The court admitted the fruits of a search pursuant to, and statements given after, an arrest contravening

---

[5](...continued)
the witnesses.   Second, because Webster was given advance notice that the government would be introducing evidence of unadjudicated offenses, he had the opportunity independently to investigate and respond to the evidence.  Third, the government introduced corroborating evidence for several of the incidents. Fourth, the statements of which Webster complains were not related to unadjudicated offenses; rather, they were statements made to law enforcement officers after his arrest.  Finally, Webster provides no reason why we should be reticent to believe any of the testimony or that the incidents occurred.

[6] *See Hall*, 152 F.3d at 398 (compelled psychiatric exam), *id*. at 400-03 (evidentiary rulings on photographs and videotape), *id*. at 403-04 (unadjudicated offenses), *id*. at 404-06 (nontestimonial victim impact statements).

the Fourth Amendment.

4. The court erred by refusing to dismiss the government's notice to seek the death penalty based on allegations of racial discrimination in death penalty charging decisions and by refusing Webster's request for discovery on that claim.

5. The court abused its discretion by refusing Webster's motion for post-trial discovery on a claim that the government had provided sexual favors to a prisoner-witness.

6. The court lacked authority to order Webster to undergo a government psychiatric exam as a condition to admitting psychiatric testimony in mitigation of punishment.

7. The court abused its discretion in granting the government's *Witt* challenge to a venireman.

8. The court's rejection of defense challenges for cause to impaired and biased veniremen denied Webster an impartial jury and his statutory right to free exercise of peremptory challenges.

9. The court erred in excusing a venireman whose juror questionnaire contained false information.

10. The court clearly erred in denying Webster's *Batson* claims.

11. The court erred by impaneling an alternate juror during the penalty phase who did not deliberate during the guilt-innocence phase.

12. The court violated Webster's constitutional rights and abused its discretion by limiting surrebuttal.

13. The court plainly erred and violated Webster's constitutional rights by entering a factual finding that he is not mentally retarded.

14. There is insufficient evidence to support the sentence of death.

15. Certain provisions of the FDPA are unconstitutional.

11

16.   The court *sua sponte* should have suppressed the testimony of Webster's co-conspirators, who testified in exchange for leniency.

We address each of these issues in turn.

A.

Webster contends that the district court erroneously instructed and materially misdirected the jury at the penalty phase. District courts enjoy substantial latitude in formulating a jury charge, and hence we review all challenges to, and refusals to give, jury instructions for abuse of discretion.[7]

A conviction will not be reversed for an alleged error in the instructions unless, when viewed in their entirety, they fail correctly to state the law. *Jones*, 132 F.3d at 243; *United States v. Flores*, 63 F.3d 1342, 1374 (5th Cir. 1995). Technical errors will be overlooked, and the court's instructions will be affirmed, if the charge in its entirety presents the jury with a reasonably accurate picture of the law. *Jones*, 132 F.3d at 243. A refusal to give a requested instruction constitutes reversible error only if the proposed instruction (1) is substantially correct, (2) is not substantively covered in the jury charge, and (3) pertains to an important issue in the trial, such that failure to give it

---

[7] *United States v. Jones*, 132 F.3d 232, 242-43 (5th Cir. 1998), *cert. granted*, 119 S. Ct. 39 (1998); *United States v. Manges*, 110 F.3d 1162, 1176 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1675 (1998).

12

seriously impairs the presentation of an effective defense. *United States v. Garcia Abrego*, 141 F.3d 142, 153 (5th Cir.), *cert. denied*, 119 S. Ct. 182 (1998); *Jones*, 132 F.3d at 242.

## 1.

Webster argues that the court erred in refusing to instruct the jury that, in assessing the aggravating factors, it could consider only his intent and conduct and not the words or acts of any other codefendant or participant in the crime. The argument is without merit.

## a.

Webster's reasoning hinges on *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987). He contends that these cases require a two-pronged focus in the decision-making process to impose a death sentence: the defendant's participation (conduct) and his intent (state of mind). It follows, Webster believes, that the court should have instructed the jury to consider only his conduct in assessing the aggravating factors.

## b.

Webster misreads *Enmund* and *Tison*. In those cases, the Court addressed the degree of culpability required of a defendant to impose a death sentence under the felony-murder doctrine. The

Court did require a certain level of culpable conduct and state of mind. *See Enmund*, 458 U.S. at 801; *Tison*, 481 U.S. at 158. But Webster takes the requirement too far.

The point of *Tison* and *Enmund* is that a death sentence may not be imposed unless the sentencer has examined the defendant's "own personal involvement in the crimes." *Tison*, 481 U.S. at 158. Enmund escaped capital punishment because he "did not kill or attempt to kill," nor did he have "any intention of participating in or facilitating a murder." *Enmund*, 458 U.S. at 798. The Tisons, on the other hand, failed to obtain a reversal, because they were sufficiently involved in the crimes. *See Tison*, 481 U.S. at 158.

The gist of these cases is that before a death sentence may be recommended, the Eighth Amendment requires that the defendant, for example, killed, inflicted serious bodily injury resulting in death, or participated in a felony with reckless disregard for human life resulting in death. The FDPA meets this requirement in § 3591, by limiting even the possibility of a death sentence to those defendants with sufficient culpability. The jury found Webster guilty of "engaging in conduct intending death to result or that lethal force would be used" and of "engaging in conduct knowing that it created grave risk of death."

Once the constitutionally-required minimum level of culpability is found, however, there is no reason why the jury cannot take

14

a broader look at the crime in assessing the aggravating factors; it need not limit itself exclusively to the defendant's conduct or intent.  Indeed, an aggravating factor properly may focus on the defendant, on the circumstances of the crime itself, or on characteristics of the victim.[8]

### c.

Furthermore, one of the FDPA's aggravating factors requires a jury to examine a factor that has nothing to do with the defendant's conduct or intentSSthe victim's vulnerability.  *See* § 3592(c)(11); *cf. Tuilaepa*, 512 U.S. at 977.  The government alleged that Lisa Rene's young age rendered her particularly vulnerable, hence constituting an aggravating factor.  Because the factor has nothing to do with Webster's conduct or intent, his proffered general instruction would have incorrectly stated the law.

In addition, the charge as a whole substantially covered the proffered instruction and sufficiently pointed the jury to Webster's conduct and intent.  The court instructed that "[i]n considering the question of intent, as it related to aggravating

---

[8] *See Tuilaepa v. California*, 512 U.S. 967, 976 (1994) (holding that "[t]he circumstances of the crime are a traditional subject for consideration by the sentencer," and may include factors such as the defendant's age); *Roberts v. Louisiana*, 431 U.S. 633, 636 (1997) (holding that a murder victim's status as peace officer performing regular duties constitutes permissible aggravating factor).

15

factors, you may consider only the intent of the defendant, Bruce Carneil Webster." The aggravating factors, other than the victim vulnerability factor, all pointed to Webster's conduct. The instructions explaining the factors repeatedly referred to Webster's conduct and intent.[9] The non-statutory factor Webster specifically attacks, "the effect of the offense on Lisa Rene and her family," focuses on the harm caused by Webster's "commission of the offense." The court did not abuse its discretion in refusing this instruction; including it would have misstated the law.

2.

Webster objects to the instruction on the "elements of intent." He argues that the court failed to require the jury to select a single element of intent, and to do so unanimously. This failure allegedly allowed the jury impermissibly to "double-weigh" a single factorSSintentSSin imposing the death penalty, skewing the process toward capital punishment.

Although Webster rightly points out the risk of unconstitutionally arbitrary application of the death penalty if the jury is permitted to double-count aggravating factors, *see Jones*, 132 F.3d at 250-51, the court did not err in this regard. The instructions

_____

[9] The court's examples included the following: "'Cruel' means that the defendant intended to inflict a high degree of pain . . .," "'[d]epraved' means that the defendant relished the killing or showed indifference . . .," and "[t]he government must prove beyond a reasonable doubt that the defendant committed the offense after substantial planning and premeditation."

16

on the elements of intent properly followed the language of § 3591(a)(2). They stated that the jury's findings as to the "elements of intent" had to be unanimous.[10] If any doubt remained, the special findings form that the jury filled out prominently displayed the word "unanimously" before the "yes" and "no" lines to be checked for each of the four elements.

In addition, the instructions accurately charged that the jury was not to weigh the elements of intent in deciding whether to impose the death penalty. At least one of the elements of intent needs to be found only as a threshold, or gateway, matter; and only once at least one is found does the weighing of aggravating factors and mitigating factors take place§§with no further consideration of the "elements of intent."

The instructions walked the jury through this sequential process. The court instructed the jury first to determine whether one of the requisite elements of intent existed. Then the instructions set forth the aggravating and mitigating factors.

The instructions nowhere indicated that the jury was to consider the elements of intent once it began to weigh the aggravating and mitigating factors. In fact, the jury specifically was instructed to weigh aggravating and mitigating factors with no

_____

[10] The court instructed that "you must as a preliminary matter unanimously agree that the government has proven beyond a reasonable doubt that the defendant . . . either . . .," followed by a list of the four possible intents, and "if you unanimously find . . ." one or more of the elements of intent, the jury was to consider aggravating factors.

17

mention of the elements of intent. The special jury form also segregated the elements of intent from the lists of aggravating and mitigating factors, and made clear the sequential nature of the process.

Finally, the court specifically instructed the jury to consider and weigh only the aggravating and mitigating factors outlined in the instructions, which did not include the elements of intent. Assuming, as we must, that the jury followed its instructions, it did not weigh the elements of intent even once. The court did not abuse its discretion in denying the proffered instruction.

### 3.

#### a.

In a similar vein, Webster argues that two of the aggravating factors overlapped, allowing the jury to weigh the same factor twice. Specifically, one statutory factor read: "the defendant committed the offense in an especially heinous, cruel and depraved manner in that it involved torture and serious physical abuse to the victim, Lisa Rene." One non-statutory factor addressed "the effect of the offense on Lisa Rene and her family, namely, that the commission of the offense caused emotional injury and anguish to Lisa Rene, and emotional injury, anguish, sorrow, and loss to her family." Webster contends that these aggravating factors are duplicative because "there is no effective distinction between

infliction of 'severe mental and physical pain or suffering upon the victim' (authorized by the court's instructions for a finding on the statutory aggravating factor) and the 'emotional injury and anguish to Lisa Rene' focused upon in the 'non-statutory' aggravating factor."

Webster points out that the charge allowed the jury to find that the statutory factor existed based on a finding of "torture," defined to include "mental as well as physical abuse" and the intent to "inflict severe mental or physical pain or suffering upon the victim," of which the victim must be conscious. Webster alleges that there is no distinction between the statutory factor's "severe mental or physical pain or suffering" and the non-statutory factor's "emotional injury and anguish."

b.

Webster failed to object to these instructions, so we review for plain error. *See Jones*, 132 F.3d at 243. The court did not err in instructing on both factors because, although they may rely on similar underlying facts, they focus on different aspects of the crime and its results.

The statutory factor directs the jury to consider whether Webster committed the offense in an especially heinous, cruel, and depraved manner, hence focusing attention on his actions and intent. The non-statutory victim impact factor, on the other hand,

19

directs the jury's attention to the harm caused by Webster to the victim and her family.  This factor looks not to his actions but to their result.  Because one factor addresses directly Webster's conduct and intent (the "manner" of commission), and the other the impact of that conduct and intent, the two factors are not duplicative.

Webster's reliance on *Jones* proves unavailing.  In *Jones*, we found two non-statutory aggravating factors duplicative.  One addressed the victim's "young age, her slight stature, her background, and her unfamiliarity with [the locale where the crime took place]," and another dealt with the victim's "personal characteristics" and the impact of the crime.  We held the factors duplicative because "'personal characteristics' . . . necessarily includes 'young age, slight stature, background, and unfamiliarity.'"  *Id.* at 250.

But the difference between the challenged factors in the case *sub judice* proves to be more than semantic.  The "heinous, cruel and depraved" manner in which a crime is carried out, even though the instructions require that the victim is conscious of the emotional abuse, does not necessarily include, nor even overlap with, consideration of the effects of the crime on the victim and her family.  The court did not plainly err in providing both instructions.

4.

a.

Webster argues, and the government concedes, that, by allowing the jury to consider premeditation with respect to the kidnaping and not just the murder, the court improperly charged the jury on the statutory aggravating factor of whether Webster engaged in "substantial planning and premeditation" of the offense.[11] The special findings form also contained language relating the premeditation to the kidnaping rather than to causing death. The statute requires a finding that "the defendant committed the offense after substantial planning and premeditation to cause the death of a person," § 3592(c)(9), obviously directing the premeditation to causing death and not to mere commission of the offense when the two diverge. The parties disagree, however, as to whether this constitutes reversible error. We find it does not.

b.

The government argues that Webster invited the erroneous instruction and now should not be heard to complain. *See United States v. Baytank (Houston), Inc.*, 934 F.2d 599, 606 (5th Cir. 1991). Although Webster's requested jury instruction properly

---

[11] The court charged that "[t]o establish the existence of the aggravating factor of substantial planning and premeditation, the government must prove beyond reasonable doubt that the defendant committed the offense after substantial planning and premeditation . . . . The amount of time needed for *premeditation of a kidnapping* in which a death occurs depends on the person and the circumstance." (Emphasis added.)

21

focused on substantial planning and premeditation for the murder, the government points to his proposed changes to the special findings form in which Webster proposed the following language: "Beyond a reasonable doubt and looking only to the conduct and intentions of the defendant, Bruce Carneil Webster, he, Bruce Carneil Webster, committed the killing of Lisa Rene after substantial planning and premeditation to commit the kidnaping of Lisa Rene." The government surmises that the court adopted this language in formulating the instructions and special issue.

Although it is possible that Webster's misstatement influenced the instructions, Webster also proffered instructions correctly applying the substantial planning and premeditation to the killing rather than to the kidnaping. Given the inconstant way in which Webster addressed the issue, we cannot conclude he invited the error.

c.

The error notwithstanding, we affirm the sentence. The FDPA provides that a "court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless." § 3595(c)(2)(C).

Our duty when the jury finds an invalid aggravating factor is to strike the factor and either reweigh the remaining factors

22

against the mitigating evidence or apply harmless error review. *See Jones*, 132 F.3d at 251; *see also Clemons v. Mississippi*, 494 U.S. 738, 741 (1990). If we choose to reweigh the evidence, we must determine what the jury would have done absent the invalid aggravator. *See Jones*, 132 F.3d at 251.

In conducting a harmless error review, on the other hand, we may inquire into whether, beyond a reasonable doubt, either (1) the death sentence would have been imposed had the invalid aggravating factor been properly defined in the jury instructions or (2) the death sentence would have been imposed absent the invalid aggravating factor. *See id*. at 252. If the government establishes that the error is harmless beyond a reasonable doubt, we may not reverse or vacate the death sentence unless such error denies constitutional rights. *See* § 3595. We may decide which of the three methods to apply, although "[i]t matters not which standard of review an appellate court chooses to apply because all three standards lead to the same conclusion." *Jones*, 132 F.3d at 252.

The parties expend a great deal of effort arguing whether the jury would have found the factor had it been accurately stated. The effort is wasted, however, because the sentence may be affirmed without that aggravating factor. We opt to apply the second method of harmless error review, and inquire into whether the sentence

23

would have been imposed absent the invalid aggravator.[12]

After removing the offensive statutory aggravating factor, we are left with two statutory factors (that Webster committed the offense in an especially heinous, cruel, or depraved manner, and that Lisa Rene was vulnerable), two non-statutory aggravating factors (Webster's future danger to others, and the effect of the crime on Lisa Rene's family), and nine mitigating factors found to exist by varying numbers of jurors. The government contends, and we agree, that the facts supporting the "especially heinous, cruel or depraved" factor alone, when weighed against the extant mitigating factors, justify a finding that the jury still would have imposed a death sentence. The addition of the other three factors merely buttresses the conclusion.[13]

Furthermore, we fail to see why the jury would have placed much emphasis on the invalid factor as it was improperly defined and charged. The import of substantial planning and premeditation to commit the offense of kidnaping pales in comparison to the brutal nature of Webster's actions and the suffering Lisa Rene must have felt as a result, so we do not think the jury would have placed significant weight on the invalid factor relative to the

---

[12] We also find that the government has established beyond a reasonable doubt that the jury would have found the aggravating factor if the instructions properly had charged the jury on it; thus we can affirm under the first harmless error review, as well.

[13] Webster asserts that we should give the aggravating factor dealing with victim vulnerability little weight because the *Hall* jury did not find it. But Webster's jury did, and we refuse to question that determination.

24

others.

Finally, the paltry mitigating factors that the jury found fail to indicate that it placed much weight on countervailing factors. No juror found that Webster had talents, capabilities, or qualities of some value to society or that he could be of some productive value in a prison setting. Only two jurors believed that he even could be controlled in a prison setting, and only two found he likely would adapt to prison. The jury found only one factor unanimously: Webster suffered from physical or emotional abuse or parental neglect during his upbringing; and yet no juror believed that this abuse caused significant impairment of Webster's ability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. The government has proven beyond a reasonable doubt that the jury would have imposed the death sentence absent the invalid aggravating factor, so its inclusion was harmless error.[14]

5.

Webster contends that the court erred when it refused to submit several nonstatutory mitigating factors.[15] Just this past

---

[14] We see no reason why the inclusion of the invalid factor rises to the level of a denial of constitutional rights that would require vacating the sentence.

[15] The rejected factors are:

8. The defendant . . . suffers from a mental disease, illness,
(continued...)

25

Term, however, in *Buchanan v. Angelone*, 118 S. Ct. 757, 761 (1998), the Court squarely held that, although "the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence," a death penalty scheme "may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence." The Court further explained that its "decisions suggest complete jury discretion is constitutionally permissible." *Id.*

The standard for reviewing jury instructions on mitigation is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* (quotation and citation omitted). Indeed, in *Buchanan*, refusing to submit four *statutory* mitigating factors during the penalty phase of the capital trial fell short of constitutional error.

Many of the mitigating factors presented to the jury touched on the ones Webster complains were omitted. To ensure that the

---

[15](...continued)
defect, or personality disorder; . . .

13. The defendant . . . has personal qualities which are worth saving; . . .

14. The defendant . . ., due to circumstances of intellectual impairment, and dysfunctional family background, and upbringing, should be extended mercy; . . .

21. The defendant . . ., if not sentenced to death, will be sentenced to life in prison without any possibility of parole or release[.]

jury considered all potentially mitigating evidence, the special findings form included a catch-all mitigation factor. The charge specifically instructed the jury that it "must consider" any other mitigating factors it found, "whether or not specifically argued by defense counsel."

The instructions left no room for the jury to ignore constitutionally relevant evidence. The court neither committed constitutional error nor abused its discretion in rejecting the mitigating factors.


6.

Webster avers that the instructions misstated the law by not requiring, once one or more jurors had found a mitigating factor to exist by a preponderance of the evidence, that all jurors consider a mitigating factor in weighing aggravating and mitigating factors.[16] Webster misreads the statute; although any one juror may find and weigh a mitigating factor, the others may make their own determinations with respect to each mitigator.

---

[16] The court charged that

> [a] finding with respect to a mitigating factor may be made by any one or more of the members of the jury, and any member who finds the existence of a mitigating factor may consider such factor established regardless of whether any other jurors agree that such mitigating factor has been established. . . . In determining whether a sentence of death is appropriate, each of you must weigh in your own mind, any aggravating factor or factors that the jury unanimously finds to exist beyond a reasonable doubt—whether statutory or non-statutory—against any mitigating factor or factors that you individually find to exist by a preponderance of the evidence.

27

Webster relies on § 3593(e), which reads, in part, "the jury . . . shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death."  Webster reads this provision to say that once any juror finds a mitigating factor, *all* jurors *must* weigh the factor.  But the quoted language does not require Webster's reading; the provision lacks any modifier indicating who must find or weigh the mitigating factor(s).

Reading the section as a whole, we conclude that Congress did not intend Webster's reading.  The prior subpart states that "[a] finding with respect to a mitigating factor may be made by 1 or more members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established for the purposes of this section regardless of the number of jurors who concur that the factor has been established." § 3593(d).  Reading the two sections *in pari materia*, we reason that the language does not contemplate forcing all jurors to consider a mitigator when any one or more finds it to exist. Rather, each juror may consider a factor regardless of whether others concur.  In addition, it would be nonsensical for Congress to require a juror to weigh a factor that he or she does not believe the evidence warrants.

Webster, in an apparent attempt to avoid this last problem,

28

argues that "[o]nce a mitigating factor has been established, then the sentencer *must* consider it, even though it may be assigned whatever weight it is deemed to deserve."  But, naturally, those jurors who did not find the mitigating factor to exist would assign it no weight, which does not differ from the result Webster hopes to avoid, i.e., not requiring them to consider it at all.  Because the plain language of the statute does not compel every juror to weigh each mitigating factor found by at least one juror, the court did not abuse its discretion in denying the instruction that would have required it.

B.

1.

The indictment alleged, *inter alia*, that Webster and others violated 18 U.S.C. § 1201(a), proscribing kidnaping.  Pursuant to that indictment, the court charged the jury that to convict, it had to find beyond a reasonable doubt the element "[t]hat the defendant held such person for ransom, reward, or some other benefit that the defendant intended to derive from the kidnapping."  The court further charged that "a benefit is any legal or illegal object of the kidnaping which a perpetrator might consider sufficient motive to induce him to undertake the kidnaping.  The government has the burden of proving whatever benefit alleged by proof beyond a reasonable doubt."

Webster objects to this instruction on the ground that, because the indictment failed to allege any specific benefit other than ransom or reward, the jury should not be able to consider any other benefit, and because the instruction fails to require unanimity on the benefit found. The government responds that the benefit is not a specific element of the crime, so it need not allege one in the indictment, nor does one need to be specified in the jury instructions; furthermore, unanimity is not required.

### 2.

We review alleged errors in jury instructions for abuse of discretion; a conviction will not be reversed for an alleged error in the instructions unless, when viewed in their entirety, they failed to state the law correctly. *Jones*, 132 F.3d at 243. These instructions did not fail to state the law correctly.

### a.

The parties agree that the kidnaping statute protects those who have been kidnaped and held for any reason. Before 1934, the Federal Kidnaping Act applied only if the captive was held for ransom or reward. *See United States v. Healy*, 376 U.S. 75, 81 (1964). Congress amended the Act in 1934 to encompass persons held "for ransom or reward or otherwise." *Id*. In *Gooch v. United States*, 297 U.S. 124, 128 (1936), the Court interpreted the "or

30

otherwise" amendment to encompass any benefit a captor might attempt to receive. Subsequently, in *Healy*, the Court held the Act is not limited to kidnapings for an ultimately illegal purpose.[17]

Consistent with the Court's pronouncements, this court held in *Clinton v. United States*, 260 F.2d 824, 825 (5th Cir. 1958), that an indictment need not include the words "for ransom, reward or otherwise." The panel reasoned that the phrase would add nothing "because obviously 'otherwise' comprehends any purpose at all." *Id.*

Webster asserts that we overruled *Clinton* in *United States v. Osborne*, 68 F.3d 94 (5th Cir. 1995). In *Osborne*, we held that the government must prove four elements of the kidnaping offense: "1) the transportation in interstate commerce; 2) of an unconsenting person who is 3) held for ransom, reward, or otherwise; and 4) the acts were done knowingly and willingly." *Id*. at 100. According to Webster, the third element requires the government to plead in the indictment and prove up at trial, and the court to instruct the jury on, some specific purpose(s) for the kidnaping.

*Osborne* does not compel this conclusion. We certainly did not purport to overrule *Clinton*'s holding that the indictment need not include a benefit; the issue was not before us in *Osborne*. And nothing in *Osborne* contravenes *Clinton*. More accurately, the

---

[17] *See Healy*, 376 U.S. at 82 (stating that "we find no compelling correlation between the propriety of the ultimate purpose sought to be furthered by a kidnaping and the undesirability of the act of kidnaping itself").

31

gravamen of the third element is the act of holding, not the benefit. If "otherwise" can include any purpose, adding it to the indictmentSSirrespective of whether it specifies the "otherwise" benefitSSadds nothing. This view consists with that of our sister circuits.[18]

---

[18] *See United States v. Adams*, 83 F.3d 1371, 1372-74 (11th Cir. 1996) (indictment sufficient that alleged only that the victim was "held"); *United States v. Martell*, 335 F.2d 764, 766 (4th Cir. 1964 (same); *Hayes v. United States*, 296 F.2d 657, 665-67 (8th Cir. 1961) (same); *United States v. Atchison*, 524 F.2d 367, 369-71 (7th Cir. 1975) (indictment sufficient that merely alleged victim was held for "ransom, reward, or otherwise"); *United States v. Bentley*, 310 F.2d 685, 685 (6th Cir. 1962) (same); *Hall v. United States*, 410 F.2d 653, 659-60 (4th Cir. 1969) (same); *Loux v. United States*, 389 F.2d 911, 914-16 (9th Cir. 1968) (same).

b.

Webster points out that in many of the above-mentioned cases, including *Clinton*, one reason the court gave for finding the lack of specificity unproblematic is that the defendant can request a bill of particulars to clarify on what benefit the government will rely. Webster made such a request, which the court denied; he complains that this prevented him from presenting an effective defense. We fail to see how.

Although the government must plead and prove that the defendant held the victim for some purpose, the exact nature of that purpose is inconsequential. Indeed, as noted, any purpose will do. In arguments to the jury, the government mentioned several possible benefits, including retribution and revenge, sexual gratification, greed, and that Lisa Rene knew too much; all are valid benefits. In light of this breadth, Webster's claim that the failure to specify a benefit in the indictment or jury instructions denied him a defense is vapid.

If any benefit will do, the only possible defense is that the defendant obtained absolutely no benefit at allSSand no pleading or jury instruction is needed to prepare the defendant for this defense. Accordingly, we decline to require specificity in the factual basis of the benefit.[19]

---

[19] *Cf*. *United States v. Barnhart*, 889 F.2d 1374, 1378 (5th Cir. 1989) (holding factual basis for falsity in perjury indictment not required).

33

c.

The only circumstance under which a jury might need to be instructed on specific potential benefits is if the jurors must agree unanimously on what benefit the defendant derived; if that is the case, failure to instruct on particular benefits (as well as the failure to instruct on the required unanimity, of course) might constitute reversible error. On the other hand, if unanimity is not required, an instruction on specific benefits proves pointless, because each juror can pick a benefit from among the facts presented at trial.

The question, then, should be framed as follows: If some jurors believed that Webster held Lisa Rene for one purpose, e.g., sexual gratification, and others believe for another benefit, e.g., revenge for a drug deal gone bad, does that disagreement, that lack of unanimity, evidence a reasonable doubt that Webster held Lisa Rene for some benefit? The inquiry is governed by *United States v. Correa-Ventura*, 6 F.3d 1070 (5th Cir. 1993).

In *Correa-Ventura*, we analyzed whether a jury needed to reach unanimous consensus on which of several weapons seized from the defendant's apartment had been used in the commission of a drug trafficking offense. In the process of holding factual unanimity was not required, we explicated the case-by-case analysis we must follow here. *See id*. at 1081.

As we explained, the unanimity rule ensures that the jury has

34

found guilt beyond reasonable doubt, and disagreement as to critical facts may reflect such doubt. *Id.* at 1078. But not all facts require unanimity. To determine which ones do, we examine "[s]tatutory language and construction, legislative intent, historical treatment of the crime by the courts, duplicity concerns with respect to defining the offense, and the likelihood of jury confusion in light of the specific facts presented." *Id.* at 1082. After considering these factors, we conclude that the jury need not concur on the benefit the defendant derived from holding the kidnaping victim.

Looking at the language of the element, we see that the *actus reus* proscribed is the "holding" of a victim. The benefit, "for ransom, reward, or otherwise," merely adds purpose to the act of holding. Looking to the offense as a whole, we see that the essential elements, stripped to the bones, are transporting and holding against consent with a *mens rea*. The "interstate commerce" serves as a mere jurisdictional hook, and the benefit language simply provides guidance to a jury in understanding the crimeSSwhy the defendant may have committed the offense. The essence of kidnaping is a non-consensual transporting and holding, done wilfully or knowingly; the language in no way implies that the benefit serves an important function in singling out the guilty from the innocent or in deterring future conduct.

The history of the offense also points to the insubstantial

role of the benefit. The Supreme Court has admonished that Congress added the "or otherwise" language because "ransom or reward" proved too narrow; Congress desired to expand the statute by eliminating the limiting effect that the phrase had. *See Gooch*, 297 U.S. at 128; *Healy*, 376 U.S. at 81-82. We should not circumscribe the statute's reach, once again giving the phrase a narrowing function, by requiring factual concurrence among the jurors.

Interpretive caselaw and the issue of duplicative convictions also support rejecting a unanimity requirement. As cited above, we and our sister circuits always have emphasized the breadth of the benefit phrase. We are aware of no case in which a court has limited the kidnaping offense through the benefit requirement.

In addition, concerns regarding duplicative convictions have not arisen. Webster does not argue that a lack of concurrence on the factual predicate of a benefit risks duplicative convictions for a single act of holding and transporting. We know of no case in which a defendant was convicted of or even charged with multiple kidnaping offenses of the same victim because it was done for more than one benefit.

Finally, the circumstances of the instant case do not justify vacating the sentence and requiring unanimity on the benefit. Several benefits were argued to the jury. There was sufficient evidence from which a juror could find that Webster was motivated

by the lure of those benefits. Indeed, if unanimity had been required, it is likely that the jury unanimously would have found several benefits garnered by Webster, including revenge and sexual gratification. The court provided a general unanimity instruction, focusing the jury's attention on the need to agree on the essential elements of the crime. Unanimity on the factual basis of the benefit is not required, and the court did not abuse its discretion in refusing Webster's instruction.[20]

C.

Webster contends that his arrest was unconstitutional and that the fruits obtained from it should have been suppressed. More specifically, he argues that the court erred by failing to suppress the fruits of the search of Webster and his automobile following his arrest, that any purported consent given by him was nullified by the illegality of the arrest, and that the court erred by failing to suppress his statements following his arrest. It readily becomes apparent that Webster's arguments hinge on his view that the arrest was unconstitutional. Because we find both this arrest and subsequent police conduct fully constitutional, the court properly admitted the fruits of the search and the subsequent

---

[20] *Cf*. *Correa-Ventura*, 6 F.3d at 1076-86 (no unanimity requirement as to particular firearm used in 18 U.S.C. § 924(c) prosecution); *United States v. Linn*, 889 F.2d 1369, 1374 (5th Cir. 1989) (holding that jury need not be unanimous as to identity of five individuals in prosecution for continuing criminal enterprise); *United States v. Sutherland*, 656 F.2d 1181, 1202 (5th Cir. Unit A Sept. 1981) (no unanimity requirement as to overt acts in multiple-object conspiracy).

statements.

1.

The issues of probable cause and reasonable suspicion, which, in this case, control the constitutionality of Webster's arrest, are mixed questions of law and fact. *See United States v. Tompkins*, 130 F.3d 117, 120 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1335 (1998). So, we review the historical facts for clear error and ultimate legal determinations *de novo. Id.* Because Webster does not challenge the findings of fact, our review is limited to a *de novo* review of the legal conclusions.

2.

The Fourth Amendment requires that all arrests be based on probable cause. *See* U.S. CONST. amend. IV; *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975). Probable cause is "defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Gerstein,* 420 U.S. at 111 (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)) (alteration in original). Based on this standard, the police had probable cause to arrest Webster.

The day before the arrest, police took a written statement from Beckley, Webster's partner-in-crime. This inculpatory statement suggested Webster's criminal involvement in the kidnaping

(and ultimate murder) of Lisa Rene. Such statements taken from an accomplice give rise to probable cause to arrest those so implicated. *United States v. Barfield*, 507 F.2d 53, 58 (5th Cir. 1975).

Matters admittedly are complicated by the fact that, although the police had probable cause to arrest Webster following Beckley's statements, they did not know exactly who Webster was. That is, the issue of identification comes into play, as the police must have had probable cause to believe that the man whom they arrested was indeed Webster. Based on the totality of the circumstances, we find that such probable cause existed.

Beckley identified Webster as "B-Love" and described him as "a black dude about 20 years old, about 5'9", 150-160 pounds, black low cut hair, brown skinned." Beckley explained how he and B-Love were involved in the sale of marihuana and how the kidnaping of Lisa Rene arose from Beckley and Webster's drug transactions.

Beckley told the police that he and B-Love took Lisa Rene to a cheap motel, tying her to a chair in a room that ended in the digits "13." Beckley led Detective Ford and FBI Special Agent Floyd to this motel, called the Pine Bluff Motel. He took them to room 513, which he identified as the room in which he and B-Love had taken Rene. Floyd interviewed the hotel manager, obtaining a receipt for room 513 in the name of Bruce Webster.

FBI Special Agent Mason and Agent McCall were assigned to assist Ford and Floyd by going to the motel to help gather

39

evidence. They were told to be on the lookout for "B-Love," who had kidnaped Lisa Rene and kept her in room 513. Mason and McCall questioned a security guard about the guests of room 513 and were told that a local man named Bruce Webster had stayed in that room, along with three other black men, on the dates in question. The guard added that Webster went by the nickname of "B-Love" and described him as "a black male, approximately 5'8" tall and 150 pounds," seen wearing a black leather cap and driving an older American, dark blue, square-looking sedan. The guard also told the agents that Webster was a drug dealer.

Later that day, the agents observed a black man driving an older American, dark blue, square-looking car and wearing a black leather cap; a woman was in the passenger seat. The agents signaled the suspect to stop; in response, the suspect sped up, apparently attempting to flee. The agents pursued, and when one of them shouted "B-Love, this is the F.B.I. Stop where you are and put your hands up," the driver stopped. The driver was, of course, Webster, also known as B-Love. At that point, the police placed Webster on the ground and handcuffed him.

The agents had probable cause to arrest Webster for kidnaping. Although they did not have personal knowledge of his specific wrongdoings, they are permitted to act on the probable cause determination of others in their department. *See Charles v. Smith*, 894 F.2d 718, 724 (5th Cir. 1990).

40

The security guard's description of B-Love was sufficiently detailed and accurate to provide the police with probable cause to believe that the man they were arresting was B-Love.[21]  The reliability (in terms of veracity) of the guard, as a disinterested witness, is presumed.  *See United States v. Hernandez,* 825 F.2d 846, 849 (5th Cir. 1987).

Moreover, "the sufficiency of a particular description is largely a factual matter," so we give greater deference to the district court's finding of probable cause under these circum-stances.  *See Pollack*, 739 F.2d at 190.  And in doing so, we must recall that "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment."[22]

3.

Even if the police initially lacked probable cause to arrest Webster, they most certainly had reasonable suspicion to stop him.  *See Terry v. Ohio*, 392 U.S. 1, 22-24 (1968); *United States v. Watson*, 953 F.2d 895, 897 (5th Cir. 1992).  Their actions following

---

[21] *See, e.g., United States v. Pollack,* 739 F.2d 187, 190 (5th Cir. 1984) (holding that probable cause existed to arrest individual described as "a white male, approximately 50 years old, 5'8 or 5'9, with a short, stocky, medium build, glasses, and a receding hairline, wearing a dark blue or black coat, a light colored shirt and blue jeans"); *United State v. Maryland,* 479 F.2d 566, 569 (5th Cir. 1973) (declaring that probable cause existed to arrest individuals described as "four Negroes, two men and two women . . . traveling in a 'black and white vinyl over green Cadillac'").

[22] *Hill v. California*, 401 U.S. 797, 804 (1971) (holding that probable cause existed even though the police arrested the *wrong person* because of an imperfect description).

this legitimate stop were likewise constitutional, so all the evidence and statements gathered from Webster are admissible.

Reasonable suspicion is a standard lower than probable cause. *Terry,* 392 U.S. at 16-22; *Watson*, 953 F.2d at 897 n.1. Reasonable suspicion sufficient to justify a *Terry* stop exists when law enforcement officials are able to point to "specific and articul- able facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. The matching description of Webster, taken together with the guard's identification of him as a drug dealer and his presence at the motel, satisfy this test of reasonable suspicion.

After stopping Webster, the police were within their constitu- tional authority to pat him down for their personal safety. *Terry*, 392 U.S. at 27-28; *United States v. Michelletti*, 13 F.3d 838, 840-41 (5th Cir. 1994) (en banc). They also were within their authority to handcuff Webster, even if probable cause to arrest him was lacking. *See United States v. Sanders*, 994 F.2d 200, 205-07 (5th Cir. 1993).

In addition, the police acted constitutionally when they asked Webster whether he had any needles in his pockets that could injure them during their pat down; such questioning, needed to protect the officers, does not constitute interrogation under *Miranda v. Arizona*, 384 U.S. 436 (1966). *See New York v. Quarles*, 467 U.S. 649, 655 (1984). Accordingly, Webster's response, indicating that

42

he had marihuana in his pocket, was not obtained in violation of *Miranda* and was fully admissible.

Webster's admission that he possessed marihuana gave the police probable cause to arrest him, at the very least for narcotics possession. This renders unproblematic the lengthy (1½-hour) detention of which Webster complains.

Lengthy detentions following *Terry* stops are often problematic, because they serve to escalate an investigatory stop, which can be initiated with only reasonable suspicion, into an arrest, which requires probable cause.[23] In this case, however, the officers' reasonable suspicion developed into probable cause when Webster indicated that he possessed drugs, and when the police uncovered the key to room 513 on his person. Consequently, the conversion of Webster's investigatory stop into an arrest is both proper and to be expected. *Adams,* 407 U.S. at 148-49. The search of Webster's person was in order as a valid search incident to a valid arrest. *United States v. Edwards*, 415 U.S. 800, 802 (1974).

Next, the police searched Webster's car, revealing two guns and other incriminating items. There are two valid, independent justifications for this police action, although only one is needed to affirm.

First, as the search of Webster's person revealed a key to

---

[23] *See Adams v. Williams*, 407 U.S. 143, 146 (1972); *see also California v. Beheler*, 463 U.S. 1121, 1123-25 (1983) (holding that whether an individual has been arrested, in the constitutional sense, is an objective, legal determination based on the circumstances of his restraint).

room 513, police now had undisputable probable cause to arrest for the kidnaping. Therefore, it was reasonable for the police thoroughly to search Webster's car for evidence of the kidnaping. *See California v. Acevedo*, 500 U.S. 565, 579-80 (1991).

Second, Webster orally consented to this search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1973). Such consent operates as a waiver of Fourth Amendment rights if, by a preponderance of the evidence, it is found to have been given voluntarily under the totality of the circumstances. *See id.* at 235-40; *United States v. Cooper*, 43 F.3d 140, 144 (5th Cir. 1995). Factors to consider in making this determination are the coerciveness of police procedures, the extent of the defendant's cooperation, his awareness of his right to refuse consent, his education and intelligence, and his belief as to whether incriminating evidence will be found. *Cooper*, 43 F.3d at 144.

Webster's experience in police procedure, resulting from his lengthy criminal record, belies the assertion that he was unaware of his rights or uneducated as to the situation he faced. And the fact that the police asked him not once but twice for permission to search his automobile (the second time being when they came to the trunk of the car) undercuts the argument that the police were coercive in their request. Under these facts, Webster's consent was freely given.

D.

Webster argues that the court erred by denying his motion to dismiss the government's notice to seek the death penalty based on racial discrimination in the charging decision and by denying his discovery request on this issue. To support the motion to dismiss, Webster offered an affidavit showing that 66% of federal death penalty cases involved black defendants. The court denied both the motion to dismiss and the motion for discovery and an evidentiary hearing, noting that Webster had failed to make out the requisite *prima facie* case that he had been singled out for prosecution but others similarly situated were not prosecuted.

1.

We review constitutional claims *de novo*. *See Estrada-Trochez*, 66 F.3d 733, 735 (5th Cir. 1995). A district court's decisions in overseeing criminal discovery, however, receive great deference on appeal. Alleged errors are subject to review for abuse of discretion, and we reverse only if a defendant establishes prejudice to substantial rights. *United States v. Mora*, 994 F.2d 1129, 1138 (5th Cir. 1993).

2.

a.

The decision to prosecute one person and not another is a

proper exercise of executive discretion with which we are reticent to interfere. *United States v. Hoover*, 727 F.2d 387, 389 (5th Cir. 1984). To establish that the government has engaged in unconstitutionally discriminatory selective prosecution, a defendant must make a two-pronged showing.

First, he needs to make out a *prima facie* showing that he has been singled out for prosecution but others similarly situated of a different race were not prosecuted. *See United States v. Armstrong*, 517 U.S. 456, 465 (1996); *United States v. Sparks*, 2 F.3d 574, 580 (5th Cir. 1993); *Hoover*, 727 F.2d at 389. In *Armstrong*, the Court stated, "The vast majority of Courts of Appeals require the defendant to produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not, and this requirement is consistent with our equal protection case law." *Armstrong*, 517 U.S. at 469. Second, he must demonstrate that the discriminatory selection of him for prosecution is invidious or in bad faith, in that it rests on such impermissible considerations as race, religion, or the desire to prevent his exercise of his constitutional rights. *See Sparks*, 2 F.3d at 580; *Hoover*, 727 F.2d at 389.

In making these requisite showings, the defendant must rebut the presumption that the government made its decision to prosecute in good faith and in a nondiscriminatory manner. *Hoover*, 727 F.2d at 389. To dispel the presumption of prosecutorial good faith, "a

46

criminal defendant must present 'clear evidence to the contrary.'"
*Id.* at 465 (quoting *United States v. Chemical Found., Inc.*,
272 U.S. 1, 14-15 (1926)).

A defendant is not automatically entitled to an evidentiary
hearing to make the required showing. He must first present facts
"sufficient to create a reasonable doubt about the constitutional-
ity of [his] prosecution" resulting from selective prosecution.[24]
Mere statistical evidence of racial disparity usually will be
*per se* insufficient to support an inference of any "unacceptable
risk" of racial discrimination in the administration of capital
punishment. *McCleskey v. Kemp*, 481 U.S. 279, 294-97 (1987).

b.

Webster has failed to make a sufficient showing that he was
singled out for selective prosecution. He has not even attempted
to show that other similarly situated individuals committing
similar acts were not prosecuted. Such a showing would be
challenging under the FDPA, as no one yet had been prosecuted under
that Act when Webster was indicted. But Webster also did not
attempt to make the showing under other federal death penalty acts.

Webster relies primarily on his statistical evidence, which

---

[24] *United States v. Jennings*, 724 F.2d 436, 445-46 (5th Cir. 1984) (finding bare generic allegations concerning the selective prosecution of racial groups insufficient to justify an evidentiary hearing); *United States v. Ramirez*, 765 F.2d 438, 440 (5th Cir. 1985) (holding "conclusional allegations of impermissible motive are not sufficient" to demonstrate the government acted in bad faith).

47

under *McCleskey* fails to rebut the good faith presumption.  Webster cites *McCleskey*, 481 U.S. at 293 n.12, which may allow finding a constitutional violation (or *prima facie* finding thereof) in very limited circumstances if the data presents a "stark" enough picture.  But the 66% figure Webster provides is no more stark than were the statistics in the Baldus Study at issue in *McCleskey*.[25]

Webster also argues that counsel would have shown that they had requested that the Department of Justice consider this racial disproportionality as a factor mitigating against authorization of the death penalty in this case, and the government refused because of "the purported 'race neutrality' required by DOJ policies in capital charging decisions."  Likewise, Webster contends that "failure of the Government to 'affirmatively act' to overcome such racially discriminatory application" of the death penalty "amounted to purposeful discrimination."  This, however, fails to establish the discriminatory purpose required under the second prong of the selective prosecution test.

Discriminatory purpose "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Id.* at 291 (quotation omitted).  The

---

[25] Baldus reported that Georgia prosecutors sought the death penalty in 70% of the cases involving black defendants and white victims, 32% of the cases involving white defendants and white victims, 15% of the cases involving black defendants and black victims, and 19% of the cases involving white defendants and black victims.  *See McCleskey*, 481 U.S. at 287.

48

above evidence, at best, shows action in spite of a putatively adverse discriminatory effect and not purposeful discrimination.

Furthermore, a non-discriminatory explanation for seeking the death penalty against Webster is evident on the facts: It is justified by the objective circumstances of the crime and the sufficiency and availability of evidence to prove the required elements under the law. These are the precise considerations the Supreme Court identified as proper and legitimate grounds for such a decision. *See id.* at 307 n.28. The verdict attests to the objective considerations, and Webster has made no effort to rebut them.

3.

Webster's attempt to obtain discovery on the issue stands on equally faulty ground. In *Armstrong*, the Court addressed the issue of the showing necessary to obtain discovery on a claim of selective prosecution based on racial discrimination. The Court first quickly disposed of any claim for discovery under FED. R. CRIM. P. 16, stating, "We hold that Rule 16(a)(1)(C) authorizes the defendants to examine Government documents material to the preparation of their defense against the Government's case-in-chief, but not to the preparation of selective-prosecution claims." *Armstrong*, 517 U.S. at 463.

Webster contends that a defendant "necessarily has a lesser

49

burden when seeking discovery to aid in proving the elements of a prima facie case of selective prosecution." The Court, however, held squarely against Webster's assertion, stating, "The justification for a rigorous standard for the elements of a selective prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim." *Id.* at 468.

Finally, Webster argues that he requested the discovery also to establish mitigating evidence that a death sentence would propagate a racially discriminatory application of the federal death penalty. Webster makes no argument other than that a defendant is entitled to present any mitigating evidence, which he was denied by denial of the discovery request.

The government aptly responds that the *Armstrong* discovery rule for selective prosecution applies, requiring a *prima facie* showing. Any other rule would allow circumvention of *Armstrong*'s requirements.

Furthermore, the Court in *Armstrong* justified its high standard for discovery in selective prosecution claims, explaining:

> Judicial deference to the decisions of [prosecutors] rests in part on an assessment of the relative competence of prosecutors and the courts. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis courts are competent to undertake. It also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by

50

> subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Governments enforcement policy.

517 U.S. at 465 (citations and quotations omitted). The competency concerns apply *a fortiori* when lay jurors are asked to analyze prosecutorial decisions.

In addition, Webster had the statistical evidence regarding the allegedly discriminatory manner in which the modern federal death penalty has been applied and yet chose not to attempt to introduce it during the sentencing hearings; this may indicate his lack of confidence in this evidence's mitigating value.

E.

Webster contends that the district court erred in denying his motion for post-trial discovery on the issue of whether one of the case's lead law enforcement investigators, Special Agent Floyd, had "purchased" the testimony of a prosecution witness, John Clay, by allowing a conjugal visit at a private residence in violation of agency guidelines. Webster argues that if discovery had verified this claim, it would have impeached the testimony of Clay and Floyd, thus constituting grounds for a new trial.

1.

We review discovery rulings for abuse of discretion. *United States v. Dukes*, 139 F.3d 469, 476 (5th Cir.), *cert. denied*, 119 S.

51

Ct. 215 (1998); *United States v. Johnson*, 127 F.3d 380, 391 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1174 (1998). We will order a new trial based on discovery violations only where the party demonstrates prejudice to his substantial rights. *Dukes*, 139 F.3d at 476. To prevail, then, Webster must establish that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different . . . . [A] reasonable probability is shown where the non-disclosure 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the jury verdict.'" *United States v. Visher*, 106 F.3d 622, 634 (5th Cir. 1997) (quoting *Westley v. Johnson*, 83 F.3d 714, 725 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 773 (1997)).

2.

The government introduced testimony from Clay during the rebuttal portion of the penalty phase. Clay, who had charges pending against him for drug dealing that included the possibility of a life sentence, was taken to the holdover cell on the second floor of the federal courthouse. When he arrived from the Mansfield Correctional Enforcement Center, Webster was present in the holdover cell. Webster then left and came back and began jumping around, saying that "there has got to be a God" because his trial had been set to a later day. Clay testified that Webster

52

also preached a thirty-minute sermon, "quot[ing] scriptures out of the Bible that has to be photographic in his mind because it was so accurate." Clay and Webster conversed in "pig latin" after Webster started using it. Clay demonstrated pig latin for the jury.

Webster then told Clay about a "master mind plan" to arrange for each of them to have sexual contact with a female inmate by manipulating the visiting process. Before the two men were taken back to Mansfield, Webster told Clay that he would write a letter to him in pig latin to explain the plan. Webster in fact sent such a letter to ClaySSthe letter was introduced into evidence, with the defense stipulation that Webster had authored it. With the prosecutor reading the letter, Clay interpreted some of the slang used.

Clay also testified that he was cooperating with the government in hopes of a sentence reduction. Counsel for Webster questioned Clay about his criminal background and his current charges, and attempted to impeach Clay by implying that he was angry with Webster because Webster allegedly had written a letter to Clay's girlfriend, who also was a prisoner at the Mansfield Correctional Center.

Floyd testified during the penalty phase regarding oral statements Webster made while in custody. The statements included that killing Lisa Rene was "just business."[26]

---

[26] Floyd also provided some of the testimony relevant to the admission of
(continued...)

53

Approximately two months after trial and two days after filing a motion for new trial, Webster filed an addendum to his motion for new trial, setting forth an allegation from a local newscast that Floyd had permitted Clay to engage in a conjugal visit with Clay's girlfriend after Floyd had taken Clay from the detention center for an unrelated investigation. Webster alleged that this "reward" to Clay should have been reported to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Webster asked the court to order the government to disclose any information that reasonably could be obtained regarding inducements given by Floyd to Clay and, specifically, that the government be ordered to disclose the results of any investigation relating to the matter. The government already had volunteered to provide the requested information to Webster, subject to confidentiality limitations.

In its response to the motion for new trial, the government reaffirmed its continuing obligation and intention to disclose any mitigating or impeaching evidence. The government further noted that it would work with Webster's counsel to help them secure affidavits that had been filed in other cases in connection with the allegations. Webster then filed a motion in which he requested the court to

order the attorneys for the government to produce and

---

[26](...continued)
Webster's confession. As discussed above, the district court properly denied the motion to suppress the confession; the questions Webster raises regarding Floyd's credibility do not alter that determination.

> hand over to the defense counsel all information associ-
> ated with the activities of Special Agent Garrett Floyd
> of the Federal Bureau of Investigation that are related
> to the granting of inducements, favors, privileges,
> rewards, concessions or anything of value to any witness
> directly or indirectly associated with this instant case.
> This order should extend as well to any other case which
> is, or may be, a part of a systematic action on the part
> of Agent Floyd or other government actors to grant favors
> to witnesses in return for their testimony.

Counsel for Webster acknowledged that he had received copies of the affidavits used in other cases involving the same allegation and that defense investigators were looking into other possible sources of information.

In response to the motion for post-trial discovery, the government noted that the district court having jurisdiction over the cases in which this allegation had been made had determined that Floyd was unaware that Clay had had sexual contact while in Floyd's custody and that a new trial was not warranted. The government asked the court to deny Webster's post-trial motion because the motion was too broad, and again reiterated its continuing discovery obligation.

> The court denied Webster's motion, stating that even
> assuming that all of the facts asserted in [Webster's]
> motion and the addendum are trueSSthat the Federal Bureau
> of Investigation Special Agent assigned with primary
> responsibility for investigating this case took federal
> prisoner John Clay from his detention facility, trans-
> ported him to the home of a female friend, and knowingly
> allowed Clay and the female to engage in sexual activi-
> ties, all in exchange for Clay's testimony in this cause,
> and the prosecutor knowingly withheld this information
> from Defendant,

the evidence was not material. Citing *United States v. Bagley*,

55

473 U.S. 667, 682 (1985), the court found that even if this information had been disclosed before trial, the result would have been the same.

3.

The court did not abuse its discretion in denying the motion for post-trial discovery. Even assuming the allegations are true, they fail to undermine confidence in the verdict. Clay was only one of many government witnesses who testified to rebut Webster's claim of mental retardation, including school teachers, counselors, principals, employers, and detention center personnel. Much of Clay's testimony focused on the letter written by Webster's own hand that set forth the "plan" for a sexual rendezvous with female inmates. It is evident from the record that Webster concocted the elaborate scheme to manipulate the detention center's visitation system and sought Clay's assistance. Clay's other testimony could be redacted, and there would still be ample evidence to support the jury's findings regarding Webster's mental abilities.

Furthermore, Clay admitted that he had testified in hopes of a reduced sentence, and the defense impeached his testimony with the allegation that Clay held a grudge against Webster. Further impeachment via the possible *quid pro quo* of sex for testimony likely would not have affected more than marginally the weight the jury gave to Clay's testimony.

With respect to Floyd's testimony, he too was only one of many witnesses who testified regarding Webster's future dangerousness. Other witnesses included Special Agent William Eppright, who testified that, on an occasion separate from the one testified to by Floyd, Webster said killing Lisa Rene was "strictly business." Mohamed Ghene testified regarding Webster's attempted robbery of his clothing store and the shots Webster fired at him from across the street. Tlisha Booth presented testimony pertaining to a shoving match over a piece of candy. Sylvia Henry, corroborated by a security guard and Booth, testified that Webster had assaulted her at a nightclub. Pine Bluff Police Department Officer Lance Lawhorn testified that, while he was transporting Webster, Webster stated that if he was not in custody he would "kill the bitch" who gave him a venereal disease. Even if Floyd's testimony regarding Webster's oral statements were redacted, the record provides ample evidence of future dangerousness.

Moreover, any damage to Floyd's credibility caused by these allegations would be mitigated by the finding of the district court with jurisdiction over the cases where the allegations were initially made that Floyd was unaware that Clay had any sexual contact while in his custody and that a new trial was not warranted. There is no reasonable probability that the verdict would have been different had the jury known of the alleged Floyd-Clay incident, so the court did not abuse its discretion in denying discovery.

57

F.

Webster argues the district court lacked a statutory or constitutional (Fifth Amendment) basis to compel him to submit to a mental health exam by a government expert as a prerequisite to introducing his own expert psychiatric testimony. We find no error.

1.

Although compelling Webster to a government psychiatric exam, the court also granted, in part, Webster's motion to limit the scope of the exam. Specifically, the court barred examination of Webster's future dangerousness. The government's witness, Dr. George Parker, however, testified that he found that Webster's incarceration would lead to "a potentially very dangerous situation." Webster argues this aspect of the testimony constitutes a Fifth Amendment violation.

Webster's argument falls well short of reversible error. First, he mischaracterizes the record. There is no evidence that any government expert was asked to[27] or did conduct an examination of Webster with regard to his future dangerousness. The reports of Dr. Coons and Dr. Parker state that they had sufficient data to assess Webster's future dangerousness without examination designed

---

[27] When first contacted and hired, before the court's limiting order, Dr. Coons was informed that part of the exam would be for future dangerousness. But nothing in the record indicates that either Coons or Dr. Parker actually conducted an exam for future dangerousness.

58

to uncover that.  Our reading of the record leads us to conclude that, contrary to Webster's assertion, Coon's testimony regarding Webster's future dangerousness did not turn on an examination in violation of the court ordered limits.

Second, Webster never objected on these grounds, so he failed to preserve the issue for appeal.  Finally, even if such testimony were given and properly objected to, the error of allowing the testimony proves harmless, because there is ample independent evidence to support a finding of future dangerousness.[28]

## 2.

The *Hall* panel avoided the question of statutory authority because it had not been properly briefed.  *See Hall*, 152 F.3d at 398.  We now face the issue and conclude that the district court had the authority to order the exam.

### a.

A district court's decisions in overseeing criminal discovery are entitled to great deference.  Alleged error is subject to review for abuse of discretion, and we will reverse only if a defendant establishes prejudice to substantial rights.  *Dukes*, 139 F.3d at 476; *Johnson*, 127 F.3d at 391.  Because the court-

---

[28] *See Satterwhite v. Texas*, 486 U.S. 249, 257-58 (1988) (citing numerous cases for proposition that constitutional errors in criminal trial are usually subject to harmless error review).

ordered exam did not violate Webster's constitutional rights, and he makes no other claim of prejudice, any finding of authority to order the exam negates prejudice to substantial rights.

b.

Although Webster correctly asserts that the court lacked statutory authority to order the psychiatric exam, a district court possesses inherent powers "reasonably useful to achieve justice," *In re Stone*, 986 F.2d 898, 902 (5th Cir. 1993) (recognizing several categories of inherent court powers), including certain powers over the administration of civil and criminal discovery, *Natural Gas Pipeline Co. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1406 (5th Cir. 1993). In fact, FED. R. CRIM. P. 57(b) provides that where no law or rule is directly applicable, "[a] judge may regulate practice in any manner consistent with federal law, these rules, and local rules of the district." The existence of the federal rules does not preempt this power, if the rules do not exclude the exercise of the specific putative inherent power. *Id.* at 1407.[29] Before the enactment in 1974 of FED. R. CRIM. P. 12.2, which establishes the procedures governing psychiatric exams at trial, numerous courts had recognized the existence of inherent judicial authority to order a defendant to give the government notice of a psychiatric

---

[29] *See also United States v. Nobles*, 422 U.S. 225, 236 (1975) (finding that FED. R. CRIM. P. 16 did not preempt an inherent power of the judiciary in criminal trial).

60

defense and to submit to examination by a government expert.[30] This court, too, in other circumstances, has found inherent power to compel a psychological examination of a criminal defendant.[31]

Acknowledging that a district court has such inherent authority furthers the goals of the FDPA. If the federal courts have supervisory authority to "formulate procedural rules not specifically required by the Constitution or the Congress" to "preserve the integrity of the judiciary by ensuring that a conviction rests on appropriate considerations validly before the jury," *United States v. Hastings*, 461 U.S. 499, 505 (1983), that authority must extend to the sentencing phase of a trial as well.

The FDPA provides, "[t]he government and the defendant shall be permitted to rebut any information received at the [sentencing] hearing, and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of

---

[30] *See, e.g.*, *United States v. Albright*, 388 F.2d 719, 722 (4th Cir. 1968); *Pope v. United States*, 372 F.2d 710 (8th Cir. 1967) (en banc), *rev'd on other grounds*, 392 U.S. 651 (1968); *Alexander v. United States*, 380 F.2d 33 (8th Cir. 1967); *Winn v. United States*, 270 F.2d 326 (D.C. Cir. 1959).

[31] *See United States v. Cohen*, 530 F.2d 43, 47 (5th Cir. 1976) (holding that court possesses inherent authority to order exam and admit psychiatric testimony regarding sanity at time of offense in conjunction with exam for competency to stand trial performed pursuant to 18 U.S.C. § 4244); *United States v. Moudy*, 462 F.2d 694, 697 (5th Cir. 1972) (same); *accord United States v. Malcom*, 475 F.2d 420, 424-25 (9th Cir. 1973) (same); *Gibson v. Zahradnick*, 581 F.2d 75, 78 (4th Cir. 1978) (same); *United States v. Green*, 544 F.2d 138, 145 (3d Cir. 1976) (holding that court possesses inherent power to compel exam by own psychiatrist under 18 U.S.C. § 4244); *United States v. Phelps*, 955 F.2d 1258, 1263 (9th Cir. 1992) (inherent authority to compel psychiatric exam to determine whether release appropriate after verdict of not guilty by reason of insanity); *United States v. Lewis*, 53 F.3d 29, 35-36 n.9 (4th Cir. 1995) (holding that court did not err in ordering psychiatric examination in light of defendant's stated intent to rely on claim of sub-normal intelligence in support of entrapment defense despite the technical inapplicability of rule 12.2(b)).

any aggravating or mitigating factor, and as to the appropriateness in the case of imposing a sentence of death." § 3593(c). Webster indicated his intention to present expert psychiatric testimony at the sentencing hearing. The government would not have a "fair opportunity" to rebut that testimony if it could not conduct an examination of its own; and to ensure that the sentence rests on appropriate considerations, the government must have the opportunity to rebut the defense's claims.[32]

Allowing the court to require disclosure of the defendant's experts' reports and to compel the defendant to submit to a government psychiatric exam on the government's motion constitutes a fair procedure for achieving these goals in a timely manner. *Cf.* FED. R. CRIM. P. 12 (establishing similar procedure for guilt-innocence phase). The court had the inherent authority to order the exam, and, therefore, did not abuse its discretion.

G.

Webster's first challenge relating to veniremen alleges that the court abused its discretion in granting the government's *Witt* challenge of Linda Vicar. A review of the record reveals that the court had sufficient grounds to grant the challenge.

_____

[32] *See Estelle v. Smith*, 451 U.S. 454, 465 (1981) (noting that forbidding a government examination "may deprive the State of the only effective means it has of controverting [the defendant's] proof on an issue that he has injected into the case").

1.

A court may excuse a prospective juror for cause because of his views on capital punishment if those views would prevent or substantially impair the performance of his duties as a juror in accordance with the instructions and oath. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Williams v. Collins*, 16 F.3d 626, 633 (5th Cir. 1994). Determination that a juror would automatically vote against the death penalty in every case is not the only situation in which that standard would require dismissal. *Flores*, 63 F.3d at 1355. The court has the discretion to excuse a juror when it "is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id*. (quoting *Witt*, 469 U.S. at 426). We give considerable deference to the decision to excuse a juror on this basis, because such decisions are based on face-to-face credibility assessments.[33]

---

[33] *See Flores*, 63 F.3d at 1355; *see also Witt*, 469 U.S. at 426-29 (although in habeas context, discussing universal reasons for deference); *United States v. Bryant*, 991 F.2d 171, 174 (5th Cir. 1993) (decision to excuse juror for actual bias reviewed for *manifest* abuse of discretion).

Webster's argument focuses on Vicar's statements that she believed capital punishment was a deterrent to crime and that "the possibility is there" that situations existed in which she could impose a death sentence. Based on this, Webster believes her ability to perform her duties as a juror was not impaired.

Other excerpts, however, support the government's concern and the court's decision. Vicar stated, "I mean from one day to the next, I don't have the same opinion of what I could do. I think there could be, depending on what the situations were, that I could say, yes, that's what it should be, that's what the penalty should be. I don't consistently, from day to day, think I could actually do that if there really is a life sentence."

Indeed, in answering several questions, Vicar wavered on whether she could sentence a defendant to death if a life sentence without parole option were a viable alternative.[34] The government,

_____

[34] During questioning by the government, Vicar gave the following answers:

A.    I guess it's not something that I have ever wanted to do. I guess I have debated since we filled out that questionnaire whether I could really do it or not, but that doesn't say I don't think it's necessary. I guess I asked the question this morning about whether we really had a life sentence that were truly without parole or any chance of getting out. I don't know if I could tell you at this time whether I could make a decision for the death penalty orSSI mean, I don't know if I could sit here and tell you today whether I could really do that or not. That's why I had the questions I had this morning about whether if you're telling me there really is a life sentence without parole, if that is really true, if you tell me in the courtroom that there is that option.

Q     . . . knowing that a person you might convict of an offense
                                      (continued...)

64

in objecting to Vicar, pointed to her demeanor, her long pauses before answering questions, and her admission of equivocation. Although she stated she could envision circumstances in which she might be able to impose a death sentence, the presence of the alternative of a life sentence without parole raised serious questions about her ability to follow the law. In addition, the whole of her testimony could have left the court with the impression that she favored the death penalty as a theoretical necessity, but would not be able to recommend it. The court did not abuse its discretion in granting the challenge for cause for Vicar's inability to apply the death sentence.

---

[34](...continued)
like this is never going to be released, ever, period, and he's going to be in prison for the rest of his life, that realistically you could never vote for the death penalty, then you really need to let us know that now, okay?

A.   I guess I feel likeSSsince there is that other option, I'm not sure. I thought before that I could vote for the death penalty, but I don't really know, if it came right down to it, if I could do it or not. I'm not saying that I could not. I guess a lot of it would just have to do with the facts of the case. I don't know if I could do it or not. I couldn't tell you that I know I could or that I know I couldn't.

Q.   . . . Why do you feel that would be such a problem? Realistically, why do you feel that's a problem?

A.   I guess I'm just torn between the fact of whether I thought there were cases that I have heard of that I thought that's exactly what they deserved, but whether I couldSSwhether that decisionSSI guess whether it conflicts with my religious beliefs, whether that decision should really be up to me or not. I don't know if I could make that decision or if I could be guaranteed that person would be in prison for life. I guess it's probably primarily justSSjust something within myself that I don't know if I could do it or not, because I might think that person deserved exactly that, but whether I should be the one here on earth to make that decision.

Webster avers that the court abused its discretion in denying several of his challenges for cause. He challenged veniremen Deanna Hailey and Carolyn Coffelt on the ground that they stated that if they found Webster guilty of the primary offense of kidnaping resulting in death, they would have to answer "yes" to the statutory aggravating factor that the defendant caused the death of the victim during a kidnaping. Webster challenged Jimmy Chambless, Kristi Magouirk, and David Hoffman because all allegedly were biased in favor of finding him guilty during the guilt-innocence phase. The court denied these challenges, forcing Webster to use peremptory challenges in all five cases. He now says the denial of his for-cause challenges was an abuse of discretion. We disagree.

1.

The Sixth Amendment right to a fair trial includes the right to an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992). In a capital sentencing context, there is the right to challenge for a cause a juror whose views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). The government has the right to challenge for cause

those veniremen whose views in opposition to the death penalty will substantially impair their duty. *Id*. As a corollary, the capital murder defendant has a right to challenge for cause any juror who will automatically vote for the death penalty in every case, because that juror "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Hall*, 152 F.3d at 407 (quoting *Morgan*, 504 U.S. at 729).

Although Webster complains that the failure to grant his challenges for cause forced him to exhaust his peremptory challenges and, after running out, to take objectionable jurors, he does not allege that any of the jurors who served was not impartial.[35] We do not face, therefore, a pure constitutional challenge. *Cf. id.* at 407-08.[36] Rather, we address Webster's statutory right to the free exercise of his peremptory challenges as a means of implementing the constitutional guarantees.

"While peremptory challenges, or the number provided by FED. R. CRIM. P. 24(b) may not be constitutionally required, it does not follow that a trial court's wrongful reduction of the number so

---

[35] Webster asserts, without substantiation or explanation, only that he was forced to take several "questionable" jurors.

[36] The failure properly to grant a challenge for cause rises to the level of a constitutional violation and warrants reversal only "if the defendant exhausts all peremptory challenges and an incompetent juror is forced upon him." *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988). Absent such a showing, the defendant has not been denied his Sixth Amendment right to an impartial jury. Webster has made no claim of incompetent jurors.

provided is not reversible error on direct appeal." *United States v. Munoz*, 15 F.3d 393, 395 n.1 (5th Cir. 1994).[37]  "'The denial or impairment of the right to exercise peremptory challenges is reversible error without a showing of prejudice.'" *Hall*, 152 F.3d at 408 (quoting *United States v. Broussard*, 987 F.2d 215, 221 (5th Cir. 1993)).  Because the district court's predominant function is determining the credibility of the veniremen, however, "deference must be paid to the trial judge who sees and hears the prospective juror." *Id.* at 407 (quoting *Witt*, 469 U.S. at 426).  "We will only second-guess the court's decision that a juror is unbiased if there is an abuse of discretion." *Id.* (quoting *Flores*, 63 F.3d at 1357).

2.

a.

Webster contends that the court should have granted his challenge to Deanna Hailey because she automatically would answer "yes" to one of the statutory aggravating factors if she had found him guilty.  Specifically, Hailey said that if she had found a defendant guilty of an intentional kidnaping that results in death, she always would find the statutory aggravating factor of § 3592(c)(1) to be true—that the defendant had caused the death

---

[37] *See also United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976) ("[A]s a general rule it is error for a court to force a party to exhaust his peremptory challenges on persons who should be excused for cause, for this has the effect of abridging the right to exercise peremptory challenges.").

during the commission of the offense.[38]

This, Webster argues, runs afoul of *Morgan*, because Hailey would fail to consider additional evidence before finding the statutory factor. In addition, Webster claims, Congress, when it provided the aggravating factor, must have contemplated a juror's consideration of something more than or different from the evidence at trial; otherwise, the aggravating factor would be superfluous. We disagree; the court did not abuse its discretion in finding Hailey unbiased and capable of serving.

First, *Morgan* does not apply here; it holds that a juror should be excused if a finding of guilt automatically would lead him to recommend a sentence of death. *See Morgan*, 504 U.S. at 729. The instant alleged error is a far cry from that in *Morgan*. The problem of which Webster complains is that a finding of guilt automatically would lead to the finding of an aggravating factor—not to a recommendation of death. An automatic finding of an aggravating factor in no way runs afoul of *Morgan*'s requirement that a juror appears able to "consider the evidence of aggravating and mitigating circumstances as the instructions require him to do," *id.*, because the automatic finding of an aggravating factor is not the same as an inability to consider aggravating and mitigating circumstances. A juror could find the aggravator of kidnaping resulting in death and yet determine that the mitigating factors

---

[38] Hailey actually answered the question, "Yes, I guess so."

69

outweigh that and other aggravating factors, sparing the defendant's life.[39]

Second, as we held in *Jones* and *Hall*, allowing a juror, having already found the existence of a certain set of facts beyond a reasonable doubt during the guilt-innocence phase, to answer "yes" to an aggravating factor based on the same facts does not raise constitutional problems. *See Hall*, 152 F.3d at 416-17; *Jones*, 132 F.3d at 248-49. Indeed, it merely allows the jury to consider the facts or elements of the offense as an aggravating factor that, having already been found beyond a reasonable doubt, it then weighsSSjust onceSSin determining whether to return a death sentence. Allowing the factor to be weighed does not violate the narrow strictures of *Morgan*, even if a juror believes the finding of guilt automatically leads to a finding of the factor.

Finally, Hailey answered Webster's hypothetical questions in ignorance of the law the court would instruct her to apply. Contrary to Webster's assertion, she did not implicitly say she would not follow instructions; to the contrary, she stated that she would be able to follow the instructions and procedures. The court did not abuse its discretion in finding that she would obey those instructions when informed how to determine the existence of

_____

[39] *Cf*. *United States v. McVeigh*, 153 F.3d 1166, 1206-08 (10th Cir. 1998) (giving *Morgan* a narrow reach by holding that court need not allow the defense to ask veniremen *Morgan*-type questions that include consideration of facts and circumstances beyond a mere finding of guilt automatically leading to a recommendation of death under the FDPA).

70

aggravating factors.[40]

b.

Webster finds error in the denial of his challenge for cause to venireman Carolyn "Kay" Coffelt. Webster believes Coffelt should have been excused for the same reason as for Hailey, although Coffelt more ambiguously answered that she would automatically find the first aggravating factor after finding guilt.[41] Coffelt also explicitly stated she would be able to follow the instructions and knew there was nothing automatic in assessing the death penalty. For the reasons given above, the district court did not abuse its discretion.

c.

Webster claims the court should have granted his challenge for cause of venireman Jimmy Chambless because he was predisposed to find Webster guilty. Chambless, on his own initiative, informed the court that he had been exposed to pre-trial publicity, "and what little I know about this, . . . I'm already leaning towards the prosecution . . . . That's not saying I couldn't be swayed with the evidence and everything that could come up, but I have got

---

[40] *See Hall*, 152 F.3d at 410-11 (statements in ignorance of law combined with affirmation that venireman will follow instructions allows district court to find venireman competent).

[41] Coffelt answered, "Possibly."

to be honest at this point, the defense is not starting even with the prosecution."

He also stated he leaned toward the prosecution because Webster had been arrested, and "if someone was arrested for this, I feel like there was a reason for it . . . . I feel like there was probably a good reason they were arrested. I'm not saying that I couldn't, again, be swayed . . . ." Based on these statements, Webster believes Chambless should have been excused for cause because he was predisposed to find an arrested defendant guilty and would shift the burden of proof onto the defense. We disagree; other statements Chambless made demonstrate the court did not abuse its discretion in denying the for-cause challenge.

When questioned by the court, Chambless agreed the verdict must be based on the evidence presented in the courtroom, and believed he could limit himself to such evidence. He affirmed that the prosecution carries the burden of proving guilt beyond a reasonable doubt, and would require as much with respect to every element. He also believed he could give a fair trial to both the defense and the prosecution, putting his predisposition aside. The court found him credible in making these statements and denied the challenge for cause.

"A person is not automatically rendered unqualified to serve as a juror merely because he has been exposed to media coverage of the charged crime. The issue becomes whether exposure to the media publicity will preclude the individual from returning a verdict

72

based solely on the person's application of the law as stated to the evidence presented." *Hall*, 152 F.3d at 411 (quoting *Bell v. Lynaugh*, 828 F.2d 1085, 1093 (5th Cir. 1987)).  We "decline to second-guess the district court's determination, made after face-to-face credibility assessment and thorough questioning, that [Chambless] could faithfully follow the court's instructions and reach a verdict based solely upon the evidence presented at trial." *Id.*[42]

---

[42] *See also Bell*, 828 F.2d at 1093 (holding that court properly declined to strike venireman for cause in similar circumstances, where pre-trial publicity predisposed venireman to find guilt).

d.

Webster contends the court should have granted his challenge for cause of venireman Kristi Magouirk for a demonstrated bias against him, an inability to provide a presumption of innocence or to follow the instructions not to listen to news reports. During voir dire, Magouirk admitted, "I guess I'm more prone to look for evidence to convict rather than evidence not to convict, reasonable doubt." She later claimed not to be prone to convict, but "I feel like the government must a have good evidence to have this person on trial." She expressed her view that black men "have a grudge against me and my race" but asserted that that feeling would not affect her decision. She also stated, "I am all for the death penalty. I would just as soon see them die for their crime than to live out their life on my taxes"; but she explained that she could recommend a life sentence without parole.

Furthermore, she later reiterated her preconceptions of evidence of guilt because "if the person is charged, they must have good evidence." She said, "I would like to give him a clean slate. It's just that, to be honest, yes, it's hard because he's here . . . . So there has got to be something against him." She also recounted news stories on the crime from as recently as the previous day. It "would be pretty hard" for her not to discuss the case with her husband and not to keep up with the press accounts. Despite Webster's claims that Magouirk showed bias and an inability to follow the instructions, the court deemed her capable of

74

serving.  We decline to second-guess that determination.

The decision is supported by ample evidence that, combined with the court's assessment of Magouirk's credibility, justifies its refusal to dismiss her for cause.  As explained, knowledge of the case from news accounts does not preclude service, and Magouirk agreed she would follow the instructions to avoid the news, assume anything she heard outside the courtroom was false, and base her decision solely on the evidence.  She recognized that the government carried the burden of proving guilt beyond a reasonable doubt.  She stated, "I guess, since I haven't heard any evidence, I don't have anything against him.  So to me he is innocent.  Until I hear the facts, then he is innocent, yes."  She affirmed that she would follow her oath as a juror and the court's instructions, including not discussing the case with her husband.  The court acted within its discretion.

e.

Webster claims error in the refusal to grant his challenge for cause to venireman David Hoffman.  Webster believes Hoffman demonstrated bias resulting from Webster's being charged with the offense and an inability to separate the victim from thoughts of Hoffman's own daughter.  Hoffman testified that, based on news accounts, he believed a girl named Lisa Rene was kidnaped, taken to Arkansas, and murdered, even though those were the elements the government would have to prove.  Recognizing the government had

brought charges, he admitted, "I guess for that reason alone I would have to say that there's a certain bias there, or else he wouldn't be here." Hoffman also stated that he might find it difficult to "wall off" thoughts of his daughter during sentencing, and they might affect his vote "to a certain extent."

Hoffman said, however, "I believe that I would be able to force [thoughts of my kids from my mind] and weigh purely on the evidence there."[43] He stated his view that much information coming from the media proved false. He believed he could keep an open mind, follow his oath as a juror, and base his verdict and sentence recommendation on the evidence and law.

A juror need not, and indeed cannot, leave his experiences and circumstances outside the jury room. What he must do is base a decision solely on the evidence presented, as seen in a fair and unbiased manner through the lens of his experiences. The district court found Hoffman excruciatingly honest, but dedicated to and capable of overcoming any difficulties he might have as a juror. On this cold appellate record, we cannot find that determination an abuse of discretion.

---

[43] Hoffman demonstrated both the difficulty and, ultimately, his ability to make a decision based on the evidence and not on his feelings for his children:

> Where I feel that I would have a harder time at that—walling that off—is if a guilty verdict is determined and sentencing begins. I would still, again, look at the individual evidence itself and weigh all the circumstances, but just being a human being, I have experiences and feelings, and that's what makes us all individuals, of course, and those feelings for my children would probably end up coming out in some form in the sentencing.

## I.

Before the jury retired for deliberations at the penalty phase, the court excused one of the jurors and elevated an alternate to replace him. Webster alleges the court erred, but we disagree.

### 1.

Webster styles the claim of error as an abuse of discretion in not granting a mistrial. We review a refusal to grant a mistrial for abuse of discretion. *United States v. Willis*, 6 F.3d 257, 263 (5th Cir. 1993). But Webster moved for a mistrial because the court had substituted an alternate juror allegedly after the jury had retired to consider its verdict. Under FED. R. CRIM. P. 23(b) and 24(c), we review a decision to substitute jurors at that late stage for prejudice. *United Stated v. Huntress*, 956 F.2d 1309, 1316 (5th Cir. 1992); *United States v. Helms*, 897 F.2d 1293 (5th Cir. 1990).

### 2.

During the punishment phase, but before the jury had begun deliberations, the court excused juror Charles Fox after he came to court in severe pain from an automobile accident. After extensive discussion with counsel for the defense and prosecution, the court decided to substitute Fox with an alternate juror, Christopher

77

Rawlinson. Rawlinson had sat through the guilt-innocence phase but had neither participated in nor observed those jury deliberations; he also sat through the penalty phase testimony. Webster moved for a mistrial and objected to using an alternate juror; the court ruled against him. In the sentencing phase charge, the court instructed the jurors, "As you will recall, a member of the jury which returned the verdict in the guilt phase of the trial was excused for health reasons. An alternate juror was substituted in his place. You are instructed that this substituted juror shall not be treated any differently than any other juror during your deliberations."

3.

Webster admits the propriety of dismissing Fox. In fact, that decision falls soundly within the court's discretion: "The district court has the discretion to remove a juror 'whenever the judge becomes convinced that the juror's abilities to perform his duties becomes impaired.'" *United States v. Leahy*, 82 F.3d 624, 629 (5th Cir. 1996) (quoting *Huntress*, 956 F.2d at 1312). Webster complains only of the lack of authority to replace Fox with an alternate.

The court presented the parties with three alternatives: continue with eleven jurors, impanel an alternate, or declare a mistrial and impanel a new jury. The court observed that "the law

78

isn't real clear" on how to proceed.  The prospect of repeating the entire penalty phase hearing made the last alternative highly unattractive, although that is the alternative Webster urged; he would not stipulate to an eleven-member jury.

If this had taken place before the jury retired at the guilt-innocence phase of the trial, the answer to the question would be simple, for rule 24(c) provides that "alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties."  Rule 24(c) also states, however, that all alternate jurors who have not replaced a regular juror "shall be discharged after the jury retires to consider its verdict."  *Id.*

When a juror is disqualified after the jury retires, on the other hand, the court has the authority to require the jury to proceed to verdict with only eleven members, with or without stipulation by the parties, and this should be done particularly in lengthy and complicated trials.[44]  We have explained our justification for proceeding with eleven jurors instead of substituting an alternate:

> An alternate juror replacing a regular juror after the jury has commenced its deliberations may be unable to participate equally with the other jurors, because he

---

[44] *See* FED. R. CRIM. P. 23(b); *Huntress*, 956 F.2d at 1317 ("We wish to emphasize that district judges in this circuit should follow Rule 23(b) rather than substitute alternate jurors when a juror is excused after deliberations begin.").

will lack the benefit of prior deliberations.  There is
a danger that the other jurors will have already formu-
lated positions or viewpoints or opinions in the absence
of the alternate juror and then pressure the newcomer
into possibly ratifying this predetermined verdict, thus
denying the defendant the right to consideration of the
case by twelve jurors.

*United States v. Quiroz-Cortez*, 960 F.2d 418, 420 (5th Cir. 1992).

The complication in the instant case, of course, is the

bifurcated trial.  The FDPA provides that if the defendant is found

guilty, the court

shall conduct a separate sentencing hearing to determine
the punishment to be imposed.  The hearing shall be
conductedSS

(1) before the jury that determined the defendant's guilt;

(2) before a jury impaneled for the purpose of the hearing
ifSS

...

     (C)  the jury that determined the defendants guilt
          was discharged for good cause

    . . . .

A jury impaneled pursuant to paragraph (2) shall consist
of 12 members, unless, at any time before the conclusion
of the hearing, the parties stipulate, with approval of
the court, that it shall consist of a lesser number.

§ 3593(b).[45]  How should a court apply rules 23 and 24, if at all,

---

[45] This language allowing for the parties to stipulate to a jury of less
than 12 members is similar to former rule 23(b), which did not allow the court
to order the case to proceed even absent stipulations.  Before changes to
rule 23(b) in 1983, caselaw allowed a court to substitute an alternate juror even
when deliberations had begun, if the parties refused to stipulate to a jury of
fewer than 12 members.  *See United States v. Phillips*, 664 F.2d 971, 996 (Former
5th Cir. Dec. 1981); FED. R. CRIM. P. 23(b), advisory committee note.  In such a
case, the defendant had to show he was prejudiced by the use of the alternate
juror.  *See Huntress*, 956 F.2d at 1316.

when the jury has returned from deciding one verdict but has yet to retire to consider the second?  This presents an issue of first impression.

The Federal Rules of Criminal Procedure apply to sentencing hearings; FED. R. CRIM. P. 1 provides, "These rules govern the procedure in all criminal proceedings in the courts of the United States . . . ."  Rule 54, FED. R. CRIM. P., excludes certain proceedings, but not sentencing hearings.  Section 3593(c) waives rule 32(c)'s presentence report requirement, which suggests the negative implication that the Rules of Criminal Procedure usually do apply to sentencing hearings under the FDPA.  The district court correctly looked at rules 23 and 24, therefore, in deciding what to do after excusing Fox.  But how should a court apply these rules in light of the fact that they fail to contemplate a bifurcated proceeding?

If, hypothetically, the entire jury had been discharged for good cause after returning its guilty verdict, the court would have impaneled an entirely new one pursuant to § 3593(b)(2).  Presumably, that jury would have included alternates.  If the court then had discharged a juror for cause before the jury had retired to consider the sentence, would the court have been entitled to elevate an alternate?  Rule 24(c) answers in the affirmative (alternate "shall replace" juror excused before jury retires).

The superficial conclusion, then, is that the court has the same authority to impanel an alternate when the same jury sits for

both phases of the trial.  And this conclusion answers Webster's primary contention:  Because an alternate was available and the jury had not retired to deliberate on its sentence recommendation, the court had the authority, under rule 24(c), to elevate the alternate.

The answer, unfortunately, is not so facile, for rule 24(c) also provides, "An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict."  This mandatory language appears to compel the court to dismiss the alternate jurors once the jury retires at the end of the first phaseSSwhen the jury first retires to consider its verdict.  If the court were to follow this mandatory language, no alternates would remain to be substituted for jurors whom the court might have to discharge before the end of the second phase.[46]  In fact, the court dismissed three of the five alternate jurors; the remaining two were retained for the penalty phase of the hearings.

The court erred in not dismissing the juror at the end of the first phase.  The mandatory language of rule 24(c) requires the court to dismiss the alternates when the jury retires to deliberate.  This conclusion adheres faithfully to the language of the rules.

Nevertheless, we affirm the sentence.  Webster did not object

---

[46] Webster points out that when the jury was first impaneled, the court instructed that "once the deliberations begin, we will dismiss any alternate who has not been seated as a primary juror."

to the failure to dismiss the alternates at the time; he complained only of elevating an alternate to the jury and not granting a mistrial.[47]   Because the jury had not retired when the court dismissed Fox and substituted Rawlinson, any available alternate could be elevated consistent with the rule.  Webster, therefore, waived the objection he should have madeSSthe failure to dismiss the alternates.  When the defendant has waived an objection for failure to follow the substitution rules, an error alone does not warrant reversal; we also review for prejudice from the resulting elevation of the substitute.[48]

Webster did not suffer prejudice.  The court provided the jury with an instruction to include the new juror equally in all deliberations.  Furthermore, the jury had not started deliberating at the penalty phase.  Those issues were distinct from those decided at the guilt-innocence phase; any overlap is irrelevant, because the jury specifically was instructed to consider everything as if for the first time.  Interestingly, on the sole penalty phase issue as to which prejudice seems possible, which is in the first aggravating factor that overlapped with the offense decided in the first phaseSSkidnaping in which death resultsSSthe jury failed to

---

[47] On appeal, Webster focuses on the same complaint.  In some places, however, he mentions the failure to dismiss the alternates when deliberations began at the guilt-innocence phase.

[48] *See Huntress*, 956 F.2d at 1316-17 (holding that failure to make the proper objection to violation of  juror rules leads to review for prejudice in the substitution).

find the aggravating factor.  Webster's generic claims of prejudice fail, as there is nothing inherently prejudicial in a rule 24(c) violation.  *See Huntress*, 956 F.2d at 1316 n.7.

J.

Webster contends that the court erred in excusing juror Urbano Gomez on learning that, in response to the juror questionnaire, he had not disclosed past encounters with the judicial system.  At the very least, Webster claims, the court erred by not recalling Gomez to ask him further questions.  We conclude the court acted within its discretion by dismissing Gomez, even absent further questioning to determine whether he had lied.

1.

After the court qualified Gomez as a juror, the prosecutor notified the court that it had uncovered a criminal record for him. The government challenged Gomez for cause because he had not answered his questionnaire truthfully. The government presented evidence that Gomez had been charged with shoplifting and spent three days in county jail, had been convicted of aggravated assault on a police officer and received one month of confinement,[49] and had been convicted of aggravated assault with a deadly weapon for which he received five years' probation. None of these was mentioned in Gomez's answer to the questionnaire.[50] Over defense objections, the court dismissed Gomez for providing false information, without recalling him for questioning.

2.

The court has discretion to excuse an untruthful juror.[51] The

---

[49] The parties agree this must have been pled down to some lesser offense, given the punishment.

[50] The most evident problem is with the response to Question 73, "Have you or a relative been convicted of any offense other than a traffic ticket?" Gomez checked "Yes," and under "details" noted "brother-in-law, child abuse." Five other questions were answered inaccurately, given Gomez's record of arrests, convictions, and probation.

[51] *United States v. Fryar*, 867 F.2d 850, 853 (5th Cir. 1989); *United States v. Coleman*, 997 F.2d 1101, 1105 (5th Cir. 1993) ("A trial judge may 'remove a juror whenever the judge becomes convinced that the juror's abilities to perform his duties have become impaired.'") (quoting *United States v. Dominguez*, 615 F.2d 1093, 1095 (5th Cir. 1980)). Webster argues that mere abuse of discretion review provides insufficient protection to a capital defendant and that the heightened need for reliability in capital cases should compel us to examine errors with greater scrutiny. He provides no authority for this claim, and we see no reason to depart

(continued...)

85

scope of the examination, if any, into juror misconduct rests within the court's sound discretion. *Fryar*, 867 F.2d at 854.[52] We will not disturb the court's findings on this issue except for want of factual support. *Coleman*, 997 F.2d at 1105. No evidentiary hearing is necessary. *Id.* (holding that court properly excused juror after government informed court that juror had failed to disclose he had been subjected to two ATF investigations). In light of the deferential standard, the court acted within its discretion in granting the challenge for cause.

### K.

Webster argues the court erred in denying his *Batson* motion, objecting to the government's use of peremptory challenges on black veniremen. We find no clear error in the court's acceptance of the government's non-racial justifications for the strikes.

### 1.

After voir dire, the court presented the parties with a list of sixty potential jurors, of whom five were black and one was Asian.[53] Each side exercised its twenty challenges. Webster

---

[51](...continued)
from the ordinary standard of review.

[52] *See also Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981) (district court has broad discretion in determining how best to conduct voir dire).

[53] There also were several hispanics whom the government did not strike.

86

objected to the government's strikes eliminating the Asian and the five blacks. To establish his *prima facie* case of racial discrimination, Webster relied solely on the fact that the government had stricken all black jurors. The court questioned whether this made out a *prima facie* case, but nonetheless called on the government to provide rationales for its strikes.

The government provided race-neutral rationales. Webster filed a motion disputing those reasons for each of the black jurors.[54] Webster argued the reasons were a pretext and that the prosecution did not strike other similarly-situated jurors who were not black. The government filed a response explaining why it found the jurors Webster claimed to be similarly situated were in fact different.

The court entered an order denying Webster's *Batson* motion, finding that (1) the motion was untimely; (2) Webster had failed to make out a *prima facie* case; (3) the government's race-neutral reasons were believable; and (4) Webster had failed to prove purposeful discrimination. We affirm on the latter two grounds.

2.

"The use of peremptory challenges to exclude veniremen 'solely on account' of race violates the equal protection component of the

---

[54] Webster conceded a legitimate reason existed for the Asian juror§§ difficulty with the English language.

due process clause of the fifth amendment." *United States v. Terrazas Carrosco*, 861 F.2d 93, 94 (5th Cir. 1988). Courts address *Batson* claims under the familiar burden-shifting scheme. *See Batson v. Kentucky*, 476 U.S. 79, 96-97 (1985); *United States v. Fields*, 72 F.3d 1200, 1206 (5th Cir. 1996). "The Supreme Court has outlined a three-step process for determining whether peremptory strikes have been applied in a discriminatory manner. First, the claimant must make a *prima facie* showing that the peremptory challenges have been exercised on the basis of race. Second, if this requisite showing has been made, the burden shifts to the party accused of discrimination to articulate race-neutral explanations for the peremptory challenges. Finally, the trial court must determine whether the claimant has carried his burden of proving purposeful discrimination." *United States v. Bentley-Smith*, 2 F.3d 1368, 1373 (5th Cir. 1993); *see also United States v. Huey*, 76 F.3d 638, 640-41 (5th Cir. 1996). The party making the claim of purposeful discrimination bears the ultimate burden of persuasion. *Bentley-Smith*, 2 F.3d at 1373.

We assume, *arguendo*, that Webster timely made his *Batson* motion and that he made a *prima facie* case. The court called on the government to provide race-neutral justifications for the use of its peremptory strikes. Once a court has taken that step, we no

88

longer examine whether a *prima facie* case exits.[55]  Our decision,
then, must rest on (1) whether the government articulated race-
neutral explanations for the exercise of its challenges and
(2) whether Webster has demonstrated that those justifications are
pre-textual and that the government engaged in purposeful discrimi-
nation.

a.

Unless a discriminatory intent is inherent in the explanation,
the reason offered should be deemed race-neutral.  *Hernandez*,
500 U.S. at 360 (plurality).  "[T]he ultimate inquiry for the judge
is not whether counsel's reason is suspect, or weak, or irrational,
but whether counsel is telling the truth in his or her assertion
that the challenge is not race-biased."  *Bentley-Smith*, 2 F.2d
at 1375.  The "race-neutral explanation tendered by the proponent
need not be persuasive, or even plausible."  *Huey*, 76 F.3d at 641;
*see also Purkett v. Elem*, 514 U.S. 765, 767-68 (1995).  It simply
must be race-neutral and honest.  Determining whether counsel
speaks the truth in offering its reasons turns on in-person

---

[55] *See United States v. Boussard*, 987 F.2d 215, 221 (5th Cir. 1993)
("appellate review should not become bogged down on the question of whether the
defendant made a prima facie showing in cases where the district court has required
an explanation")(citing *United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir.
1987)); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality) ("Once
a prosecutor has offered a race-neutral explanation for the peremptory challenges
and the trial court has ruled on the ultimate question of intentional
discrimination, the preliminary issue of whether the defendant had made a prima
facie showing becomes moot.").

credibility assessments, so we review for clear error. *Huey*, 76 F.3d at 640-41; *Fields*, 72 F.3d at 1206.

The government offered reasons for excusing each of the five jurors, with concerns ranging from a juror's establishing a rapport with defense counsel to a fear that none of the five would be able to recommend a death sentence when the time came, and from relatives with criminal records to relatives living in the city where the murder took place. The court accepted and believed these explanations. Having reviewed the record, we cannot say the court clearly erred.

### b.

At the third stage of the inquiry, Webster bears the burden of establishing that the government engaged in "purposeful discrimination" based on race. *Purkett*, 514 U.S. at 767; *Bentley-Smith*, 2 F.3d at 1373 ("The ultimate burden of persuasion always lies with the party making the claim of purposeful discrimination."). The "[p]roof of racially discriminatory intent or purpose . . . 'implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker selected a particular course of action at least in part because of, not in spite of, its adverse effects upon an identifiable group.'" *United States v. Garcia*, 1 F.3d 330, 335 (5th Cir. 1993) (quoting *Hernandez*, 500 U.S. at 360). Webster fails to meet this burden.

90

Webster offers no direct evidence of purposeful discrimination, but rather argues that the government's proffered reasons are pretextual, and the government did not dismiss similar white jurors.[56] Because the determination turns on credibility assessments, we review for clear error at this stage as well. *Bentley-Smith*, 2 F.3d at 1373; *United States v. Seals*, 987 F.2d 1102, 1109 (5th Cir. 1993).

The government offered distinguishing characteristics for each of the jurors Webster claims were similarly situated. They had different combinations of qualities, and some had more government-desired qualities than did the jurors the government preempted. *See United States v. Jimenez*, 77 F.3d 95, 100-01 (5th Cir. 1996) (other redeeming qualities relevant). Although Webster asserts the proffered reasons for striking the black jurors are mere proxies for race, he provides no basis as to why; and the reasons resemble ones we have accepted in the past.[57] The court did not find the proffered reasons pretextual and found no other evidence of purposeful discrimination; we cannot say it clearly erred.

---

[56] *See Bentley-Smith*, 2 F.3d at 1374 (noting difficulty of bringing forward such evidence, and frequent necessity of relying on rebuttal of proffered reasons and comparison to jurors not stricken).

[57] *See, e.g., United States v. Fields*, 72 F.3d 1200, 1206 (5th Cir. 1996) (juror trying to develop rapport with defense attorney); *United States v. Stedman*, 69 F.3d 73, 739 (5th Cir. 1995) (potential juror's brother convicted of a criminal offense, another potential juror appeared disinterested; another juror had lived in area of concern in the case; another juror's sister had been arrested for a narcotics charge); *United States v. Jackson*, 50 F.3d 1335, 1341 (5th Cir. 1995) (prosecutor believed that potential juror gave hostile look to prosecutor); *United States v. Nixon*, 977 F.2d 921, 923 (5th Cir. 1992) (potential juror appeared to prosecutor to express animosity toward prosecution).

L.

The court forced Webster to choose one of two expert psychiatric witnesses to testify during surrebuttal.  Webster claims this limitation violated his due process rights.  We find no error.

Webster styles his claim of error as a due process violation. Due process requires a fair opportunity to defend against the charges, including calling and cross-examining witnesses; keeping information, including witnesses, from the jury may violate due process.  *See*, *e.g.*, *Montana v. Egelhoff*, 518 U.S. 37 (1996); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *Washington v. Texas*, 388 U.S. 14, 23 (1967).  "Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process of law."  *United States v. Thompson*, 130 F.3d 676, 686 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 2307 (1998).

We never have intimated, however, that this due process right extends to presenting witnesses at surrebuttal.  Indeed, we know of only two published opinions that have addressed limitations on surrebuttal in a due process context.[58]  Even assuming surrebuttal

---

[58] *See United States v. Clark*, 617 F.2d 180, 183, 187 (9th Cir. 1980) (recognizing as due process claim, but treating under abuse of discretion standard); *United States v. One Single Family Residence Located at 15526 69th Drive N.*, 778 F. Supp. 1215, 1219 (S.D. Fla. 1991) (finding due process violation for a complete denial of surrebuttal).

implicates due process concerns, we cannot say that the court's limitation of Webster's surrebuttal to one of two expert witnesses whom the court considered cumulative was so arbitrary and fundamentally unfair as to deprive him of due process.[59]

## M.

After entering a sentence of death on the verdict, the court filed a finding entitled Factual Finding Regarding Mental Retardation in which the court stated, "Webster is not mentally retarded and . . . he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him.  As a result, the defendant Webster is not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty."[60]  Webster objects to this finding on several grounds:  (1) It was made in contravention of

---

[59] Typically, we review the decision to permit or deny surrebuttal under the abuse of discretion standard. *See, e.g., United States v. Alford*, 999 F.2d 818, 821 (5th Cir. 1993); *United States v. Moody*, 903 F.2d 321, 330 (5th Cir. 1990).  The Ninth Circuit has examined a due process claim under the same standard. *See Clark*, 617 F.2d at 187.  Under this standard, too, limiting surrebuttal that the district court considers cumulative rests soundly within its discretion. *See*, *e.g.*, *United States v. O'Brien*, 119 F.3d 523, 531 (7th Cir. 1997) (no abuse of discretion where surrebuttal would be cumulative); *United States v. Blackstone*, 56 F.3d 1143, 1146 (9th Cir. 1995) (same); *United States v. Wilford*, 710 F.2d 439, 452 (8th Cir. 1982) (same); *United States v. Burgess*, 691 F.2d 523, 531 n.19 (4th Cir. 1982) (same); *United States v. Stirling*, 571 F.2d 708, 736 (2d Cir. 1978) (same).

[60] Section 3596(c) provides,

A sentence of death shall not be carried out upon a person who is mentally retarded.  A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person.

93

the FDPA; (2) it was made in derogation of Webster's rights to due process and effective assistance of counsel; (3) it was contrary to the greater weight of the credible evidence; and (4) it was inconsistent with the verdict on this issue.[61]  We conclude that the court took proper action, and the finding was supported by the evidence.

Webster failed to object to the factual finding.  Our review, therefore, is limited to plain error.  *United States v. Calverley*, 37 F.3d 160, 162 (5th Cir. 1994) (en banc).  To find plain error, we must perceive (1) an error by district court, in that it deviated from a legal rule, (2) that was clear and, at a minimum, obvious under current law at the time of the trial, and (3) the error must affect substantial rights.  *Id*. at 162–63.

1.

Webster alleges the factual finding was in contravention of the FDPA's statutory scheme, but the statute fails to address how to ensure that the mandate of § 3596(c) is carried out.  Because the statute fails to provide guidance, and no case has addressed this issue, the law is not pellucid; the court did not plainly err in its *sua sponte* finding that Webster is not mentally retarded.

---

[61] Webster intimates that imposing the death sentence on him, if he is mentally retarded, would violate the Eighth Amendment.  The Supreme Court has rejected this argument.  *See Penry v. Lynaugh*, 492 U.S. 302, 340 (1989) ("[W]e cannot hold today that the Eighth Amendment precludes the execution of any mentally retarded person . . . simply by virtue of his or her mental retardation alone.").

Webster argues that the statute provides sufficient guidance. We disagree.  Webster points to § 3593(b)(3), which provides that the court will act as a fact-finder "upon the motion of the defendant and with the approval of the attorney for the government."  Webster interprets this to preclude any fact-finding by the court absent the defendant's motion.  The conclusion, however, does not flow from the statute.

Section 3593(b) provides that "the judge who presided at the trial . . . shall conduct a separate sentencing hearing to determine the punishment imposed.  The hearing shall be conducted . . . (3) before the court alone, upon the motion of the defendant and with the approval of the attorney for the government."  This provision refers only to the determination of the sentence; it is located in the section captioned "Special hearing to determine whether a sentence of death is justified."  It in no way implies that all court fact-finding must be on the defendant's motion.

Webster also asserts that, in the absence of a specific statutory scheme, the only logical conclusion is that the jury must be the fact-finder on the issue of mental retardation.  This "logical" claim suffers from gaps in reasoning.

First, only §§ 3592 and 3593 address issues that a jury may be called on to consider.  Section 3592 lays out all of the factors for the finder of fact to consider§§the mitigating and aggravating factors.  Section 3593 explains the procedure for the sentencing

95

hearing, including laying out the options for who the fact-finder may beSSjury, newly impaneled jury, or judge.

Section 3596 addresses "Implementation of a sentence of death." It is here that Congress chose to indicate its restriction on who could be executed. Placement of the consideration here, rather than in the earlier sections addressing the issues for the jury to consider in imposing the sentence, belies Webster's assertion that the issue obviously belongs to the jury.

In addition, although Webster did request and receive submission of the mitigating factor that he "is or may be mentally retarded," he did not request a jury instruction that placed in the jury's hands the job of factually finding whether Webster is mentally retarded. That the jury could consider whether Webster "is *or may be* retarded" falls woefully short of the factual finding required in § 3596 of mental retardation to prevent the implementation of the death sentence. The lack of a jury instruction request, along with failing to object to the factual finding, suggests that Webster's "logical assumption" placing this issue in the jury's hands was no more obvious to him at trial than it was to the district court.

The statutory scheme simply does not answer who decides this issue, so we cannot say the court's decision clearly contravened the FDPA. Given the lack of clarity, the court did not commit plain error in deciding the issue itself.

2.

Webster asserts that the procedure the court chose violated due process and deprived him of effective assistance of counsel. Neither is true. Webster rests these claims on the fact that the court acted without statutory authority and without notice to him. Bare assertions aside, Webster provides no analysis as to why the court's determination violates the Constitution.

The alleged denial of effective assistance of counsel presumably rests on Webster's lack of opportunity to present his case. Even assuming this rises to the level of constitutional error, it is harmless. Webster had just finished presenting voluminous evidence to the jury, in support of his claim of mental retardation.[62] The court had ample information before it to make its decision; indeed, just before the jury retired, Webster had asked the court to find him mentally retarded as a matter of law, taking the mitigating factor out of the jury's hands. Webster makes no showing of prejudice to his substantial rights by arguing there is something additional he would have presented to the court. The court did not plainly err in failing to provide Webster with notice, and did not deprive him of a fundamentally fair trial.

3.

---

[62] *Cf. United States v. Bachynsky*, 949 F.2d 722, 732-33 (5th Cir. 1991) (holding that sentencing court cannot base decision on matters outside of presentence report without notice to defendant to provide "ample opportunity to raise his factual contention.").

Webster contends that the finding that he is not mentally retarded is against the greater weight and credibility of the evidence. The standard of review for a finding that a defendant is not mentally retarded under § 3596 presents an issue of first impression. Because it is a factual finding, we adopt the clearly erroneous standard.[63]

The government presented substantial evidence to support the finding. Furthermore, only four of the twelve jurors found that Webster is or may be mentally retard and that he suffers from low intellectual functioning. We cannot say the court clearly erred in deciding that Webster is not mentally retarded.

4.

Webster contends that the court's determination conflicts with the verdict on this issue. Webster fails to indicate the import of this argument, aside from supporting his claim of a constitutional violation and his assertion that the finding contradicts the greater weight of the evidence.

Only four of twelve jurors concluded Webster "is or may be mentally retarded." Webster's failure to convince a majority of the jurors alone suggests the court's finding is not inconsistent with the verdict. Furthermore, those four jurors found only that he is or *may be* mentally retarded. Obviously, this mitigating

---

[63] *Cf. United States v. Kimbrough*, 69 F.3d 723, 733 (5th Cir. 1995) (noting that we review factual findings in examining a sentence imposed for clear error).

factor requires less certainty than does the determination that he is not mentally retarded.

As a result of this lesser standard, we can conclude that eight jurors were not convinced that he even "may be" mentally retarded; they believed he was not. We cannot conclude that the court's agreement with a majority of the jurors constitutes a clear, obvious error.

N.

Webster argues that the evidence does not support the special findings of the existence of the aggravating factors and that the sentence of death was imposed under the influence of passion, prejudice, or some other arbitrary factor. This contention stems directly from the FDPA's requirement that a court of appeals "shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under section 3592." § 3595(c)(1).

Webster fails to distinguish between these two requirements as distinct responsibilities of an appellate court. Rather, he suggests that the only way we can fulfill our responsibility under the provision as a whole is to conduct "a *de novo* review and a balancing of the evidence." Any other method, Webster claims, will

fail to ferret out which verdicts were imposed under the impermis-sible factors.[64] An appellate court, however, is a court of review. We do not sit as a second jury. Instead, we will address the two aspects of our review in turn. *See Hall*, 152 F.3d 426 (addressing each in turn, rather than engaging in one unified, *de novo* review).

1.

First, we must determine whether the evidence supports the jury's special findings of the aggravating factors. The statute does not clarify what standard of review we should use. Nothing in the FDPA, however, indicates that it alters our ordinary standards of review.[65] To protect the jury's domain, we apply the usual standard of sufficiency of the evidence.[66]

"Review for sufficiency of the evidence is decidedly narrowSSa [finding of an aggravating factor] must be affirmed if a rational trier of fact could have found that the evidence established the essential elements of [its existence] beyond a reasonable doubt."[67]

---

[64] Webster also suggests this requires a proportionality review; we see no basis in the statute for such an assertion.

[65] *See United States v. Chandler*, 996 F.2d 1073, 1083 (11th Cir. 1993) (holding similar provision of 21 U.S.C. § 848(q)(3) does not alter ordinary standards of review).

[66] *See Hall*, 152 F.3d at 426 (finding "the record contains ample evidence from which the jury could conclude beyond a reasonable doubt" that the aggravating factors existed).

[67] *United States v. Ramirez*, 145 F.3d 345, 350 (5th Cir. 1998), *petition for cert. filed* (Sept. 28, 1998) (No. 98-6687); *United States v. Cluck*, 143 F.3d 174, 180 (5th Cir. 1998) (noting that "we review the evidence in the light most favorable
(continued...)

In view of this record, a rational jury could find beyond a reasonable doubt that all four remaining aggravating factors exist.

## 2.

Our next responsibility is to ensure that the sentence was not handed down under the influence of passion, prejudice, or some other arbitrary factor.  Again, Webster asserts this requires a *de novo* re-weighing of the evidence, for any other assessment will fail to negate the possibility that arbitrary factors were at work.

We question whether this is an accurate statement of our responsibility under the FDPA.[68]  We need not decide this issue today, however, for we have already conducted a thorough re-examination of the aggravating and mitigating factors in part IV.A.1.c, *supra*, as part of our harmless error review.  We also see nothing in the record indicating that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.  The death sentence is warranted by the jury's specific findings.

## O.

Webster launches a variety of attacks on the constitutionality

---

[67](...continued)
to the jury verdict"), *petition for cert. filed* (Sept. 26, 1998).

[68] *See Hall*, 152 F.3d at 426 (stating that "[w]e have found nothing in the record indicating that the jury's recommendation of a death sentence was motivated in any degree by passion, prejudice, or any other arbitrary factor").

101

of the FDPA.  We entertained and rejected most of these arguments in the past, *see Hall*, 152 F.3d at 413-19; *Jones*, 132 F.3d at 239-42, foreclosing our reconsideration of them today.[69]  Those arguments that we have not heard in the past we consider *de novo*. *See United States v. Bailey*, 115 F.3d 1222, 1225 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 866 (1998).

## 1.

Webster's constitutional challenges that we have addressed in the past we deal with expeditiously.  Contrary to Webster's arguments, (1) the FDPA provides sufficient safeguards to prevent the arbitrary imposition of the death penalty, *Jones*, 132 F.3d at 241; (2) the FDPA sufficiently circumscribes its delegated authority with 'intelligible principles' to avoid violating the nondelegation doctrine, *id.* at 239; (3) the Constitution does not mandate "proportionality review," that is, a comparison of the penalties imposed in similar cases, *id.* at 240; (4) the FDPA's relaxed evidentiary standard at the sentencing hearing is not unconstitutional, *id.* at 241-42; (5) the "especially heinous, cruel or depraved manner" aggravating factor is not impermissibly vague, at least where the vagueness is cured by the statutory limitation that the offense involve torture or serious physical abuse and by

---

[69] *See Garcia Abrego*, 141 F.3d at 151 n.1 ("It has long been the rule of this court that no panel of this circuit can overrule a decision previously made by another." (internal quotation marks omitted)).

further limitation in the jury instructions, *id*. at 249; *Hall*, 152 F.3d at 414-15;[70] and (6) the FDPA's inclusion of the "mere fact" that Webster was convicted of kidnaping and murdering Lisa Rene as an aggravating factor does not constitute constitutionally impermissible "stacking," or double-counting, *Jones*, 132 F.3d at 249; *Hall*, 152 F.3d at 416-17.[71]

## 2.

Webster raises three constitutional arguments that we address as matters of first impression.  We reject them *seriatim*.

## a.

Webster argues that the FDPA is unconstitutional for failing significantly to narrow the class of offenses to which the death penalty applies.  Under *Maynard v. Cartwright*, 486 U.S. 356, 363-64 (1988), the government may not make every unjustified intentional killing qualify for the death penalty.  The FDPA does precisely that, Webster argues, by making the four mental states of murder aggravating factors that qualify the defendant for capital punishment under § 3591(a).  Webster's argument stems from a

---

[70] Webster also asserts, without analysis, that the "substantial planning and premeditation" aggravator is impermissibly vague.  His argument is foreclosed by our analysis of the same language in the analogous 21 U.S.C. § 848(e) death penalty scheme.  *See Flores*, 63 F.3d at 1373-74.

[71] Further, because the jury did not find the aggravator of which Webster complains, he cannot claim his sentence is impaired.

misreading of the statute.

As the government points out, § 3591(a) does not set forth a list of aggravating factors, but, on the contrary, serves a gatekeeping function. Section 3591(a) codifies the command in *Enmund*, 458 U.S. at 797, and *Tison*, 481 U.S. at 157, to limit the imposition of the death penalty to those murderers who both undertake felony participation and demonstrate at least reckless indifference to human life. Satisfaction of these elements only begins the death penalty inquiry; it does not and cannot establish death penalty eligibility by itself. The limiting factors, which Webster claims are lacking, are, of course, the aggravating circumstances set forth in § 3592(b) and (c), which guide the jury in its capital decision after it finds at least one element of intent under § 3591(a) as a threshold matter.

b.

Webster contends that the FDPA is unconstitutional because it permits the multiple weighing of aggravating factors (specifically, the § 3591(a)(2) *mens rea* factors). This argument stems from the same fundamental misunderstanding of § 3591(a) discussed above. *See* part IV.N.2.a, *supra; see also* part IV.A.2, *supra* (discussing "double weighing"). As we have explained, § 3591(a) does not set forth aggravating factors, but rather serves as a preliminary qualification threshold. The fact that a defendant could satisfy

more than one of these via the same course of action does not, therefore, constitute impermissible double counting. Thus, although Webster is correct in noting that many courts have held that "double counting" of aggravating factors is to be avoided, the FDPA does not present such a problem.[72]

## c.

Webster asserts that by precluding consideration of "race, color, religious beliefs, national origin, or sex of the defendant or of any victim" as a mitigating factor, the FDPA is unconstitutional. *See* § 3593(f). Webster correctly interprets the FDPA, but incorrectly interprets the Constitution; the FDPA can be constitutional only by precluding such factors.

The Equal Protection Clause protects from purposeful state discrimination on the basis of race. *Shaw v. Reno*, 509 U.S. 630, 642 (1993). The Due Process Clause of the Fifth Amendment provides this same "equal protection" against the federal government. *Bolling v. Sharpe*, 347 U.S. 497, 498-500 (1954). Court proceedings, especially criminal trials, implicate state action, therefore bringing them under equal protection scrutiny. *Georgia v. McCollum,* 505 U.S. 42, 49-55 (1992); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 621-29 (1991).

---

[72] As we have said in part IV.A.2, *supra*, the instructions sufficiently informed the jury not to weigh the elements of intent.

105

More specifically, the Equal Protection Clause prohibits the state from using race in its decision-making, unless it can meet the "most exacting scrutiny . . . justified by a compelling government interest."[73] In the realm of capital sentencing, this standard never can be met, because race is a "totally irrelevant factor." *Zant v. Stephens*, 462 U.S. 862, 885 (1983). Therefore, the FDPA can pass constitutional muster only if it is interpreted absolutely to prohibit racial considerations in sentencing. Because we are obligated to interpret a statute in such a way as to preserve, if possible, its constitutionality, *Rust v. Sullivan*, 500 U.S. 173, 190 (1991); *United States v. Bird*, 124 F.3d 667, 678-79 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1189 (1998), we reason that race cannot be considered as either a mitigating or aggravating factor under the FDPA.

Although the use of race in government decision-making is, as a general matter, "odious to a free people whose institutions are founded upon the doctrine of equality," *Hirabayashi*, 320 U.S. at 100, the use of race in sentencing determinations is particularly invidious. "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose v. Mitchell*, 443 U.S. 545, 555 (1979). And, in capital sentencing, the use of race becomes more offensive still:

---

[73] *Palmore v. Sidoti*, 466 U.S. 429, 432-33 (1984); *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943); *Hopwood v. Texas,* 78 F.3d 932, 939-40 (5th Cir.), *cert. denied*, 518 U.S. 1033 (1996).

> Considering the race of a defendant or victim in deciding if the death penalty should be imposed is completely at odds with th[e] concern that an individual be evaluated as a unique human being.  Decisions influenced by race rest in part on a categorical assessment of the worth of human beings according to color, insensitive to whatever qualities the individuals in question may possess.

*McCleskey*, 481 U.S. at 336 (Brennan, J., dissenting).

Although divided in its decision, the Court in *McCleskey* was unanimous in its acknowledgment of "the illegitimacy of race as a consideration in capital sentencing."  *Id.* at 341 (Brennan, J., dissenting); *id.* at 292-93 (majority opinion).  Webster would have us go against this precedent, and rule that a defendant can be spared the death penalty because of his race.  Such practices are precisely those forbidden by the Equal Protection Clause.  *Id.* at 341 (noting that "enhanced willingness to impose the death sentence" or "diminished willingness to render such a sentence" are impermissible when based on race).

In sum, a long line of Supreme Court precedent admonishes that the guillotine must be as color-blind as is the Constitution. *See McCleskey,* 481 U.S. at 292-93; *Zant*, 462 U.S. at 885; *Rose,* 443 U.S. at 555.  Today's decision recognizes this precedent in interpreting the FDPA in the only way constitutionally permissible: as prohibiting the consideration of race in sentencing.

Webster has constructed an artificial conflict, however, between the FDPA and Supreme Court precedent regarding mitigating evidence.  He reads *Penry v. Lynaugh*, 492 U.S. 302, and *Lockett v.*

107

*Ohio*, 438 U.S. 586 (1978), as mandating the use of race in sentencing. Such a reading of *Penry* and *Lockett* is erroneous for at least two reasons: It ignores the concept of relevancy, and it would cause those cases to conflict with the Fourteenth Amendment for the reasons discussed above.

*Penry* and *Lockett* hold that in capital sentencing, a defendant must be permitted to introduce all "evidence *relevant* to the defendant's background or character . . . that mitigate against imposing the death penalty." *Penry*, 492 U.S. at 318 (emphasis added).[74] As a matter of law, race is "totally irrelevant to the sentencing process." *Zant*, 462 U.S. at 885; *McCleskey*, 481 U.S. at 316 (discussing the unconstitutionality of using the "irrelevant factor of race" in sentencing). Therefore, when the FDPA and the Supreme Court speak of "background or character" evidence, they obviously mean to permit, and can mean to permit only, the specific beliefs and life experiences of the defendant in question.

Thus, although race *per se* is an irrelevant and inadmissible factor, the *effects* and *experiences* of race may be admissible. If a defendant can show that his life has been marked by discrimination or some other set of experiences, irrespective of whether the

---

[74] *See also McCoy v. North Carolina*, 494 U.S. 433, 440 (1990) (explaining that the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" from its meaning during the case in chief; evidence is relevant if "it tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value") (quoting *McCoy v. North Carolina*, 372 S.E.2d 12, 45 (N.C. 1988) (Exum, C.J., dissenting)).

result, in part, of his race, then that properly might be admissable as relevant mitigating background or character evidence. But this is a far cry from using race in and of itself as a proxy for such a set of beliefs and experiences. Pigmentation does not define a person's character or background; the life that a person has led and the things that he has experienced do.

## P.

We permitted Webster to file a supplemental brief raising an additional issue on appeal, arguing that his conviction and sentence were based on testimony that was illegally induced from his co-defendants. Citing *United States v. Singleton*, 144 F.3d 1343 (10th Cir.), *vacated for reh'g en banc,* 144 F.3d 1361 (10th Cir. 1998), Webster contends that the testimony of his co-defendants against him was induced by the government in violation of 18 U.S.C. § 201(c)(2).[75] Because we find no plain error in the failure *sua sponte* to suppress the co-defendants' testimony, we

---

[75] Section 201(c)(2) reads,

WhoeverSS

directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom;

shall be fined under this title or imprisoned for not more than two years, or both.

109

deny Webster's attempt to raise this issue for the first time on appeal.

1.

In *Singleton*, a panel held that the plain language of § 201(c)(2) prohibits prosecutors from making promises "of value" to witnesses in exchange for testimony. According to the panel, such prohibited promises include promises not to prosecute for certain offenses, promises to inform authorities of cooperation, and promises to inform the court of cooperation. *See Singleton,* 141 F.3d at 1348. Webster claims that the government's promises to his co-defendantsSSnot seeking the death penalty, agreeing to guilty pleas for lesser crimes, not prosecuting other acts stemming from the same incident, dismissing remaining indictment counts, notifying the court of cooperation, and filing a motion for downward departure in sentencingSSviolate the plain language of § 201(c)(2) in the same manner as did the promises in *Singleton*.

2.

a.

Because Webster did not move to suppress the testimony of his co-defendants, the issue of their testimony's legality presents an entirely new issue. We may consider this question on appeal,

therefore, only if it constitutes plain error.[76]

We find plain error "only when the appellant shows that (1) there is an error, (2) the error is plain, and (3) the error affects her substantial rights." *Ravitch,* 128 F.3d at 869 (citing *Olano*, 507 U.S. at 732). Even if we find such an error, however, we will not "exercise [our] discretion to correct such errors unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

"Error is defined as a deviation from a legal rule in the absence of a valid waiver." *Calverley*, 37 F.3d at 162. "Plain is synonymous with 'clear' or 'obvious' and 'at a minimum' contemplates an error which was 'clear under current law' at the time of the trial." *Id.* Finally, "affecting substantial rights" is understood to mean that the error "must affect the outcome of the proceeding." *Id.* at 164.

b.

Webster argues that the court erred by failing *sua sponte* to apply § 201(c)(2) and suppress the testimony of his co-defendants. Moreover, he argues that without the testimony of his co-defen-

---

[76] *See United States v. Olano,* 507 U.S. 725, 731 (1993) ("No procedural principle is more familiar to this Court than that a [right] may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.") (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944) (internal citations omitted)); *see also United States v. Ravitch*, 128 F.3d 865, 869 (5th Cir. 1997); *Calverley,* 37 F.3d at 162; *Helms v. United States*, 340 F.2d 14, 19 (5th Cir. 1964).

dants, there is great doubt that he would have been convicted.

Although Webster's argument that the suppression of co-defendant testimony substantially would have affected his conviction is persuasive, Webster faces an insurmountable burden in showing that the court plainly erred. At the time of trial, *Singleton* had not yet been handed down. Thus, the court did not commit plain error when it did not follow a decision that had not yet been decided. Moreover, even if *Singleton* had been decided before trial, decisions of other circuits are not binding on the courts of this circuit, so according to the "current law" of this circuit, the testimony of co-defendants still would have been admissible.[77]

The best Webster can argue is that, at the time of his trial, the applicability of § 201(c)(2) to government plea bargains in this circuit was uncertain.[78] "The uncertainty manifest in [an] area of the law illustrates that any error on the part of the trial court could not have been plain." *Calverley*, 37 F.3d at 165.

---

[77] We recently agreed to review a claim that was not raised until appeal when we found there had been an intervening change in the law. *See DSC Communications Corp. v. Next Level Communications*, 107 F.3d 322, 326 n.2 (5th Cir. 1997). Unlike Webster, however, the appealing party in *DSC Communications* relied on an intervening change in the law of this circuit, whereas Webster relies on a vacated opinion of another circuit.

[78] The uncertainty of this circuit's law on this point is already anticipated in two recent district court decisions. In *United States v. Duncan*, 1998 U.S. Dist. LEXIS 11123 (E.D. La. July 15, 1998), the court refused to order a new trial based on § 201(c)(2). But in *United States v. Fraguela*, 1998 U.S. Dist. LEXIS 14347 (E.D. La. Aug. 27, 1998), the court granted a new trial and adopted the *Singleton* panel's reading of § 201(c)(2).

Webster challenges a district court decision on the basis of a new interpretation of an existing law even though no Fifth Circuit precedent directly supports his reading of § 201(c)(2).[79] At most, he can support the uncertainty of § 201(c)(2)'s applicability to government plea bargains. A court's failure to apply an uncertain interpretation of a statute is far from plain error. Rather than finding plain error by adopting a new interpretation of an existing statute based on the vacated decision of another circuit, we deny Webster's challenge to the court's failure to suppress the testimony of his co-defendants.

AFFIRMED.

---

[79] Because we find no plain error in the failure to suppress the co-defendants' testimony, we do not reach the question of the proper reading of § 201(c)(2). A review of this circuit's precedents shows, however, that we consistently have upheld government efforts to provide benefits to witnesses in exchange for testimony when challenged on other grounds. The district court did not err by conforming to this precedent.

In *United States v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987) (en banc), we explained our views on the propriety of giving benefits in exchange for witness testimony when we held that contingent compensation for witnesses may occur as long as the nature of such compensation is fully disclosed to the jury. We noted that "[n]o practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence." *Id*. We went on to point out that "courts uniformly hold that such a witness may testify so long as the government's bargain with him is fully ventilated so that the jury can evaluate his credibility." *Id*. Thus, our general rule has been to allow the government to confer benefits upon witnesses in exchange for testimony (even contingent monetary compensation).

Along with our sister circuits, we also explicitly have upheld admitting the testimony of witnesses who were promised reduced sentences. *See United States v. Kimble*, 719 F.2d 1253 (5th Cir. 1983); *see also United States v. Evans*, 697 F.2d 240 (8th Cir. 1985); *United States v. Miceli*, 446 F.2d 1253 (1st Cir. 1971); *United States v. Vida*, 370 F.2d 759 (6th Cir. 1966); *Lyda v. United States,* 321 F.2d 788 (9th Cir. 1963) (discussed in *United States v. Dailey*, 759 F.2d 192, 198-200 (1st Cir. 1985)).

113